Burle B. BEARD, Appellant,

v.

Dan BAUM, Harold A. Cameron, Sharon McLeod, William B. McMullen, Stephen C. Sisk, and Caroline C. Venusti, individually and as employees of the State of Alaska: and The State of Alaska, Appellees.

No. S–3229.

Supreme Court of Alaska.

Aug. 3, 1990.

**20.** Our disposition makes it unnecessary to address any of the other issues raised in this appeal.

Thomas R. Wickwire, Law Office of Thomas R. Wickwire, Fairbanks, for appellant.

Raymond Funk, Asst. Atty. Gen., Fairbanks, and Douglas B. Baily, Atty. Gen., Juneau, for appellees.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

MOORE, Justice.

Burle Beard, a State Department of Transportation ("DOT") employee, claims that after he made public allegations of corruption at DOT, his supervisors engaged in a pattern of harassment tactics to force him to resign. Beard filed a complaint in superior court against the state and several individual supervisors alleging various causes of action including: (1) wrongful constructive discharge, (2) intentional infliction of emotional distress, (3) denial of due process, (4) violation of 42 U.S.C. § 1983, and (5) defamation. The superior court struck the first three of these claims from Beard's complaint on the ground that he did not exhaust his remedies under his union's collective bargaining agreement ("CBA"). The superior court granted summary judgment against Beard on the other two claims. Beard appeals each of these rulings. We affirm in part, reverse in part, and remand for further proceedings.

## I. Facts and Proceedings

Burle Beard worked for the Right of Way section of DOT from 1975 until he resigned on August 22, 1986. The terms of Beard's employment were governed by the CBA between the state and the Alaska Public Employees Association ("APEA"). In April 1985, Beard became the APEA building representative. At that time, Beard believed that several of his co-workers and supervisors were violating DOT personnel rules. Beard alleged that they falsified timesheets and leave slips and misused state time and property. The Fairbanks Internal Review Office of DOT investigated Beard's charges. In its final report of August 21, 1985, it concluded that only two of the twenty-one allegations were substantiated. The Office recommended that management prevent these practices in the future.

On August 27, 1985, William McMullen, Director of Design and Construction for the DOT Northern Region, met with Beard and gave him a copy of the report. Beard was disappointed with the findings and referred to the report as a "whitewash" and a "cover-up." After McMullen told Beard that he assumed the internal review was conducted in good faith, Beard said that he would not let the issue drop and intended to go to the media. McMullen responded that DOT would not tolerate any further activities that would have a disruptive effect.

Beard alleges that several of the individuals he charged with wrongdoing engaged in a series of retaliatory "pressure tactics" against him. Beard alleges that two supervisors, Harold Cameron and Sharon McLeod, voted him out as building representative for APEA. In July 1985, McLeod rated Beard's performance "low acceptable" citing complaints that Beard wasted time and copied other workers' timesheets.[1] Beard also alleges that his supervisors: (1) reduced his workload to mundane busy-work assignments, (2) unfairly scrutinized details of his performance, (3) transferred him frequently among different sections of DOT, and (4) falsely accused him of stealing a typewriter.

Bruce Senkow, the APEA field representative, testified by affidavit that Beard complained to him that his supervisors were harassing him at work by apportioning work assignments and structuring his work environment to make it as uncomfortable as possible. Senkow told Beard that these claims were not grievable since they

---

1. Beard filed a grievance to have the McLeod evaluation removed from his file. After an investigation, the evaluation was removed and replaced by another that also rated Beard "low acceptable."

were "not provable by the correspondence and personnel file documents" and because the matters were left to "management prerogative" under Article 5 of the CBA. Beard did not file a grievance making any of these allegations.

Beard alleges that the harassment he endured on the job produced a considerable amount of stress. On February 24, 1986, Beard saw Dr. James R. Simmons at the Virginia Mason Clinic in Seattle on account of back and neck pain. Over the next several days, Dr. Simmons conducted a series of tests to determine the cause of the pain. The tests revealed no adequate physical explanation. On June 5, 1986, Beard related to Dr. Simmons that he was under a considerable amount of stress because of the situation at work. At that time Dr. Simmons opined that Beard's muscle tension and pain stemmed from his "conflicts at work." On his doctor's advice and the advice of Jerry Apple, his acting supervisor, that he would be fired, Beard resigned on August 22, 1986.

On February 26, 1987, Beard filed a complaint in superior court against McMullen alleging misrepresentation, defamation, and intentional infliction of emotional distress. The court dismissed the intentional infliction of emotional distress claim on McMullen's motion on May 9, 1987. McMullen filed a motion for summary judgment on the other two counts. Beard moved to amend his complaint to assert additional claims and join additional defendants including the State of Alaska. Beard alleged the following counts:

I. Intentional, and/or Negligent Misrepresentation
II. Defamation
III. Intentional Infliction of Emotional Distress
IV. Breach of Implied Covenant of Good Faith and Fair Dealing
V. Wrongful Constructive Termination
VI. Denial of Due Process
VII. Denial of Equal Protection of the Laws
VIII. Denial of Freedom of Speech
IX. Violation of 42 U.S.C. § 1983

The court granted Beard's motion to amend but struck counts III, V, and VI from the complaint. Beard moved for reconsideration of the dismissal of the intentional infliction of emotional distress claim of the original complaint as well as the striking of counts III, V, and VI of the amended complaint.

After a series of motions to dismiss and motions for summary judgment, the court issued a Memorandum Decision on November 1, 1988. The court concluded that its original actions were correct on the ground that "Beard's remedy is through the grievance procedure as set forth in the union agreement." The court then granted the state's motion for summary judgment on the rest of the counts. The court granted final judgment against Beard on January 25, 1989 and awarded the state attorney's fees and costs. Beard appeals the court's dismissal of his claims for wrongful constructive termination, intentional infliction of emotional distress, and denial of due process and the court's entry of summary judgment against him on his claims for violation of 42 U.S.C. § 1983 and defamation.

## II. Exhaustion of Contractual Remedies

■ The superior court struck Beard's claims for constructive discharge, intentional infliction of emotional distress, and denial of due process on the ground that he failed to exhaust the grievance procedures specified in the CBA. We have held that "an employee must first exhaust his contractual or administrative remedies, or show that he was excused from doing so, before he may pursue a direct judicial action against his employer."[2] If we determine that Beard is excused from exhausting his contractual remedies, we still may

---

**2.** *Casey v. City of Fairbanks,* 670 P.2d 1133, 1136 (Alaska 1983). When an employee is required to pursue his remedy under a mandatory arbitration clause of a CBA, there is an additional question whether that remedy is exclusive. *See Public Safety Employees Ass'n v. State,* 658 P.2d 769, 772–73 (Alaska 1983).

affirm the superior court's decision to strike the claim from the amended complaint if there is another legal basis for doing so. *See Walt v. State*, 751 P.2d 1345, 1351 n. 6 (Alaska 1988).

■ Under the CBA, Beard was required to submit any dispute with management to the grievance procedures.[3] Beard is excused from grieving his constructive discharge and intentional infliction of emotional distress claims under the CBA because Senkow, his union representative, refused to file a grievance for Beard's allegations of harassment underlying these claims on Beard's behalf.

Under the collective bargaining agreement at issue in *Casey v. City of Fairbanks*, 670 P.2d 1133 (Alaska 1983), Casey could not pursue his grievance without the cooperation of his shop steward. 670 P.2d at 1135 n. 1. The evidence showed that Casey initially discussed his termination with his shop steward and reported his grievance directly to the union business agent after he was terminated. 670 P.2d at 1135. We held that Casey was excused from exhausting his remedies under a collective bargaining agreement because he made a good faith effort to grieve his termination claim through his union and his union refused to represent him. 670 P.2d at 1136–37.

In this case, Senkow testified that Beard complained to him that his supervisors were harassing him to make his work environment intolerable. Senkow told Beard that he could not pursue the grievance because the actions Beard complained of fell under management's prerogative under Article 5 of the CBA. Under the CBA grievance procedures, Beard could not pursue his grievance past the initial steps without the cooperation of an APEA representative.[4] Like Casey, Beard could not comply with the grievance procedures established by the CBA because his union representative refused to represent him. Any such attempt would have been futile. Under these circumstances, we hold that Beard is excused from exhausting his remedies under the CBA for his claims of constructive discharge and intentional infliction of emotional distress.

■ Since the superior court erred in concluding that Beard was not excused from exhausting his contractual remedies as to each of these claims, we must reverse the superior court's decision striking the claims unless they are not legally viable. *See* Alaska R.Civ.P. 12(b), (f). Beard's claim for constructive discharge is legally viable. Federal courts unanimously have recognized a claim for constructive discharge to prevent employers from avoiding their legal obligations with respect to a formal discharge when they create working conditions so intolerable as to force an employee to resign.[5] We implicitly recognized

---

**3.** Article 10, section 1 of the CBA provides that any dispute between an employee and the employer is grievable: "a grievance shall be defined as any controversy or dispute arising between APEA or an Employee or Employees and the Employer." That section also provides that only grievances "which involve[ ] the application or interpretation of the terms of this Agreement … may be submitted to arbitration for settlement." We assume without deciding that Beard was required to submit his claims to the grievance procedures even if his claims are not arbitrable.

**4.** Step one of the grievance procedures set forth in Article 10 of the CBA provides that an employee may submit his grievance to his immediate supervisor. The employee also may take his grievance to step two by writing to the division head without the cooperation of APEA. However, the CBA states that "GRIEVANCES AT STEP THREE AND BEYOND MUST BE PRO-

CESSED THROUGH APEA BUSINESS REPRESENTATIVES." (Emphasis in original).

**5.** *See, e.g., Sure–Tan, Inc. v. N.L.R.B.*, 467 U.S. 883, 894, 104 S.Ct. 2803, 2810, 81 L.Ed.2d 732 (1984) (employer violates statute preventing retaliatory discharge for union involvement when "it purposefully creates working conditions so intolerable that the employee has no option but to resign—a so-called "constructive discharge."); *Young v. Southwestern Savings and Loan Ass'n*, 509 F.2d 140, 144 (5th Cir.1975) ("if the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation, then the employer has encompassed a constructive discharge and is as liable for any illegal conduct involved therein as if it had formally discharged the aggrieved employee."); *N.L.R.B. v. Holly Bra of California*, 405 F.2d 870, 872 (9th Cir.1969) ("An employer cannot do constructively what the act prohibits his doing directly … and caus-

a cause of action for constructive discharge in *Klondike Industries Corp. v. Gibson,* 741 P.2d 1161, 1166 n. 5 (Alaska 1987). Today, we make explicit that where an employer makes working conditions so intolerable that the employee is forced into an involuntary resignation, the employer is as liable for any illegal conduct involved therein as if it had formally discharged the employee.

■ In this case, Beard's claim is that by creating conditions so intolerable as to force him to resign, the state violated its duty under Article 5(c) of the CBA to discharge him only for just cause. The state is as liable for violating this duty if Beard was constructively discharged as it would be if it had formally discharged him without just cause. Since Beard has alleged harassment, his constructive discharge claim is legally viable. Therefore, the superior court erred in striking this claim from Beard's complaint.

■ Beard's intentional infliction of emotional distress claim may be legally viable. We recently reaffirmed our adoption of the *Restatement (Second) of Torts'* elements of intentional infliction of emotional distress: "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Oaksmith v. Brusich,* 774 P.2d 191, 200 (Alaska 1989). In light of the difficulty of establishing these elements, we have required that the trial court "make a threshold determination whether the severity of the emotional distress and the conduct of the offending party warrant a claim of intentional infliction of emotional distress." *Richardson v. Fairbanks North Star Borough,* 705 P.2d 454, 456 (Alaska 1985). To be legally viable, Beard's claim must meet this standard, and not the lower standard of Civil Rules 12(b) and 12(f).

Since Beard has presented evidence of harassment and of emotional distress, his claim for intentional infliction of emotional distress may be legally viable. Therefore, the superior court may have erred in dismissing the claim. On remand, the court should evaluate this evidence to determine whether it is sufficient to support Beard's claim. *See King v. Brooks,* 788 P.2d 707, 710–11 (Alaska 1990).

■ The final claim that the superior court struck from Beard's complaint is denial of due process. Beard alleges that his supervisors' conduct constituting a constructive discharge deprived him of due process of law because he was not given a pre-termination hearing. This claim has no legal basis. Beard's due process claim depends on his having a property right in continued employment. *See Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985). In this case, the just cause requirement in Article 5(c) of the CBA gives Beard a property interest in continued employment. *See* 470 U.S. at 538–39, 105 S.Ct. at 1491–92. Beard's due process rights, however, are only triggered if that interest is deprived, that is, if he is discharged. In this case, the question of discharge is the very subject of dispute. Whether Beard was deprived of his property interest in his job depends on the merits of his constructive discharge claim, that is, whether the appellees engaged in such harassing conduct as to constitute a constructive discharge. Beard does not have a due process right to a hearing to determine whether his due process rights themselves are triggered.[6] To require such a hearing effectively would decide the question of constructive discharge in Beard's favor. The state is entitled to judgment on Beard's due process claim as a matter of law. Therefore, the superior court properly dismissed the claim.

ing working conditions to become intolerable as a means of terminating employment is forbidden conduct.").

**6.** Both the timing of and the question to be decided at such a hearing defy sensible descrip-

tion. Beard's argument implies that whenever a state employee is considering resignation, he is entitled to a hearing on the question whether he is being harassed and if so whether there is just cause for the harassment.

## III. Violation of 42 U.S.C. § 1983

▮▮▮ Beard alleges that his supervisors in their individual capacities violated section 1983 by depriving him of his right to freedom of speech under the first amendment of the United States Constitution.[7] Specifically, Beard maintains that he was constructively discharged because he spoke out on alleged fraud and embezzlement and a cover-up at a state agency, matters of public concern. The superior court granted the state's summary judgment motion on this claim on two alternative grounds. First, the court held that the individual appellees were shielded from liability under their qualified immunity as public officials. Second, even if they were not immune, the court held that they did not violate Beard's rights because Beard's speech was not constitutionally protected.

▮▮▮ Whether public officials may assert a qualified immunity defense in a section 1983 action depends on whether they should have known that their conduct violated a person's statutory or constitutional rights:

> [O]fficials "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Whether an official may prevail in his qualified immunity defense depends upon the "objective reasonableness of [his] conduct as measured by reference to clearly established law."

*Davis v. Scherer*, 468 U.S. 183, 191, 104 S.Ct. 3012, 3017, 82 L.Ed.2d 139 (1984) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)).

▮▮▮ Alaska law on the issue of termination of public employees for the exercise of their first amendment rights is clearly established. *See Wickwire v. State*, 725 P.2d 695 (Alaska 1986); *State v. Haley*, 687 P.2d 305 (Alaska 1984); *City and Borough of Sitka v. Swanner*, 649 P.2d 940 (Alaska 1981). As we explained in *Wickwire*:

> A three-pronged showing is required to establish that [an employee's] discharge violated his free speech right: 1) that he engaged in protected activity; 2) that this activity was a "substantial" or "motivating" factor in the decision to fire him; and 3) that the state has failed to demonstrate that he would have been fired even if the protected speech had not occurred.

725 P.2d at 700 (citing *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977)). In determining what constitutes protected speech, we apply the balancing test adopted by the Supreme Court in *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968):

> [A] government employer [may] limit the First Amendment rights of an employee only if it can demonstrate that its legitimate interest in promoting efficiency in its operation outweighs the interests of the employee in commenting upon matters of public concern.

*Wickwire*, 725 P.2d at 700. We "construe the 'public concern' criteria broadly to encompass speech on a wide range of sub-

---

7. Beard's claim against his supervisors for violation of section 1983 because they deprived him of his right to freedom of speech under Article I, section 5 of the Alaska Constitution is meritless. Section 1983 creates a cause of action for deprivation of rights guaranteed by *federal* constitutional and statutory law. *Maine v. Thiboutot*, 448 U.S. 1, 4, 100 S.Ct. 2502, 2504, 65 L.Ed.2d 555 (1980). Deprivation of rights guaranteed by state law are not actionable under section 1983. *Williams v. Treen*, 671 F.2d 892, 900 (5th Cir. 1982), *cert. denied*, 459 U.S. 1126, 103 S.Ct. 762, 74 L.Ed.2d 977 (1983).

Beard also alleged that the state and the individual appellees in their official capacities violated section 1983 on the same ground. The superior court granted the state's motion for summary judgment on this claim on the basis of our ruling in *Vest v. Schafer*, 757 P.2d 588 (Alaska 1988) that a state is not a person within the meaning of section 1983. Beard's argument for error notes only that the issue is presently before the United States Supreme Court. The Supreme Court has agreed with this court that states and state officials sued in their official capacities are not "persons" under section 1983. *Will v. Michigan Dep't of State Police*, — U.S. ——, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Beard concedes the point in his reply brief.

jects." *Id.* Whether speech is protected under the *Pickering* balancing test is a question of law.[8]

The superior court ruled that Beard's supervisors were protected by their qualified immunity from Beard's claim that they deprived him of his first amendment rights. However, the court did not base this conclusion on the premise that the law in this area was unclear. Rather, the court simply decided the issue on the merits by judging that the supervisors' conduct was objectively reasonable. This is not a proper basis on which to rule that the supervisors are protected by their qualified immunity. This case is not analogous to *Walt v. State*, 751 P.2d 1345 (Alaska 1988) where we affirmed the superior court's ruling that a public officer had qualified immunity from Walt's claim of denial of due process when the legal basis of the claim, the Supreme Court's *Loudermill* decision, had not been decided at the time of termination. 751 P.2d at 1349.

The issue then is only whether the superior court erred in granting summary judgment on Beard's claim on the ground that Beard's speech was not protected. In concluding that Beard's speech was not protected, the superior court did not even reach the *Pickering* balancing test because it decided that "Beard's statements do not address a legitimate issue of public concern." The court reasoned that since the state already had investigated Beard's allegations of corruption at DOT, there was no remaining issue of public concern.

The superior court's holding ignores Beard's persistent allegation that the internal review of Beard's claims was a whitewash. This is not simply a matter of personal concern. An allegation of corruption at a state agency raises an important issue of public concern. Both this court and the Supreme Court have found speech to address issues of public concern on substantially less serious issues.[9] This case is not analogous to *Wickwire* where we held that an assistant attorney general's comments regarding internal office matters that did not involve a possible breach of public trust did not rise to the level of a public concern. 725 P.2d at 702–03. Beard's comments raise the issue of a serious breach of public trust that clearly rises to the level of a public concern.

Whether Beard's speech is protected depends on whether the state's interest in maintaining an efficient workplace outweighs Beard's interest as a citizen in speaking out on alleged public corruption. *See Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734. The state notes that there is evidence in the record that after the internal review, Beard continued to discuss his accusations at work and was disruptive. Beard was told to keep his accusations to himself in the workplace absent any new evidence or face disciplinary action. Even if true, this evidence is only relevant to establishing the state's interest in maintaining an efficient workplace if the disruption was caused by the speech for which Beard alleges he was constructively discharged. Beard claims that his discharge was motivated at least in part by his supervisors' desire to retaliate for his statements to the press and other public officials. The state has presented no specific evidence that this speech disrupted the workplace. With respect to these statements, Beard's interest in exposing alleged public corruption outweighs any general state interest in

---

8. 725 P.2d at 700 n. 5. The state argues that none of this analysis is applicable since Beard was not fired. This argument is unpersuasive since an employee who is constructively discharged cannot have fewer rights than an employee who is formally discharged. *See supra* p. 1350. What is true is that Beard's section 1983 claim against the individual appellees for violating his constitutional rights is dependent on the resolution of his constructive discharge claim. However, this does not justify the superior court disposing of Beard's claim on summary judgment.

9. *See Connick v. Myers*, 461 U.S. 138, 149, 103 S.Ct. 1684, 1691, 75 L.Ed.2d 708 (1983) (official pressure on employees to work for political candidates held to be issue of public concern); *State v. Haley*, 687 P.2d 305, 314 n. 6 (Alaska 1984) (presence of international corporations in Alaska held to be issue of public concern); *Swanner*, 649 P.2d at 944 (quality of police service held to be issue of public concern).

maintaining an efficient workplace. Therefore, this speech is protected. Since at least some of Beard's speech is protected, the superior court erred in granting the state summary judgment on Beard's claim that his supervisors deprived him of his first amendment rights by constructively discharging him.

## IV. Defamation

■■■■ The first amendment's protection of free and open debate on public issues limits the ability of public officials to recover damages for defamation. *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). To recover damages for defamation, a public official must prove that the statement was published with actual malice. 376 U.S. at 279–80. The protection of the actual malice standard also extends to public figures. *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 163–65, 87 S.Ct. 1975, 1995–97, 18 L.Ed.2d 1094 (1967). A person may be a public figure for all purposes or only for purposes of a particular set of issues:

> [The public figure] designation may rest on either of two alternative bases. In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions.

*Gertz v. Welch*, 418 U.S. 323, 351, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789 (1974).

■■■ Beard alleges that McMullen defamed him by his statements published in an October 6, 1985 article in the *Fairbanks News–Miner*. Beard objects to the following statements: Beard's rating of low acceptable "accurately reflects his value to the department;" "Beard won't let go of this thing;" "[h]e's become obsessed by it;" "the allegations were primarily a bunch of smoke;" and "Beard's refusal to let the issue die is disrupting work in the right-of-way section." The superior court granted summary judgment on the ground that Beard was a public figure and that he failed to introduce any evidence that McMullen made the statements with actual malice. We agree.

Beard is clearly a public figure with respect to his allegations of corruption at DOT since he brought the issue to public attention by going to the press. Nonetheless, Beard argues that he is not a public figure with respect to the issue of his job performance. In *Rybachek v. Sutton*, 761 P.2d 1013 (Alaska 1988), we were careful in holding that a columnist on mining and natural resource issues was a public figure only "within the limited range of issues concerning natural resources and mining in Alaska." 761 P.2d at 1014. The state counters that Beard voluntarily injected himself into a public controversy concerning his job performance since he told the News–Miner that as a result of his allegations of corruption his supervisors gave him poor evaluations to force him out. Because Beard linked his job performance to the issue of corruption at DOT, Beard is a public figure with respect to both issues. Therefore, the superior court was correct in ruling that Beard was a public figure for all issues addressed in McMullen's statements.

■■■ The remaining issue is whether the superior court was correct in granting summary judgment on the issue of actual malice. To establish actual malice, a public figure must prove by clear and convincing evidence that the defendant acted with knowledge that the alleged defamatory statement was false or in reckless disregard of the statement's truth or falsity. *New York Times*, 376 U.S. at 279–80, 285–86, 84 S.Ct. at 725–26, 728–29. The actual malice standard is a subjective standard requiring "that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). Summary judgment is appropriate if there is no evidence that the defendant entertained such doubts. *Moffatt v. Brown*, 751 P.2d 939, 944 (Alaska 1988). Beard has introduced no evidence

indicating that McMullen entertained any serious doubts as to the truth of his statements. In fact, given the results of the internal review, McMullen had good reason to believe the truth of his statements. Given McMullen's meetings with Beard where Beard told him that he would continue to pursue his allegations, it would not be unreasonable to believe that Beard was "obsessed" with the issue and "wouldn't let it die." Finally, Beard produced no evidence indicating that the July 22, 1985 evaluation of his most recent performance at the time the article was published was inaccurate. Therefore, the superior court correctly granted summary judgment to McMullen on Beard's defamation claims.

In light of our disposition of this case, it is unnecessary for us to consider the court's award of attorney's fees to the state. The superior court's judgment is AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.