**MOUNT JUNEAU ENTERPRISES, INC.,** Alaska Trams, Inc., Arnt I. Antonsen, Charles Keen, and Karen Keen, Appellants,

v.

**JUNEAU EMPIRE, Appellee.**

No. S–5651.

Supreme Court of Alaska.

March 17, 1995.

Rehearing Denied April 18, 1995.

Phillip Paul Weidner, Weidner & Associates, Inc., Anchorage, for appellants.

L. Merrill Lowden and E. Budd Simpson, Birch, Horton, Bittner & Cherot, Juneau, for appellee.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

## OPINION

RABINOWITZ, Justice.

### I. INTRODUCTION

Mount Juneau Enterprises, Alaska Trams, Inc., Arnt I. Antonsen, Charles Keen and

Karen Keen (collectively Mount Juneau Enterprises) sued the Juneau Empire, contending that two of the newspaper's articles libeled them. Mount Juneau Enterprises challenges the superior court's dismissal of its libel action following the court's grant of the Juneau Empire's summary judgment motion as to whether Charles Keen was a public figure and whether the Juneau Empire acted with actual malice. Mount Juneau Enterprises also challenges the superior court's award of attorney's fees to the Juneau Empire.

## II. FACTS AND PROCEEDINGS

Alaska Trams, Inc. (Alaska Trams) and Mount Juneau Enterprises joined together to build a tramway from downtown Juneau to the top of Mount Juneau. Charles Keen was president of Alaska Trams, and had financial interests in both Alaska Trams and Mount Juneau Enterprises. In 1989, Keen, his wife, and the two corporations purchased property for the tramway project from the City and Borough of Juneau (City). In addition, the corporations obtained a building permit from the City for construction of the tramway. As of September 1990, Alaska Trams was in bankruptcy but was seeking to reorganize and be taken out of bankruptcy, and to obtain financing for the project.

On September 12, 1990, the Juneau Empire published an article by reporter Jeanine Pohl under the headline "Trustee Deals Blow to Tramway Project." Several statements from this article are at issue in this litigation:

Another blow has been dealt to developer Chuck Keen's plans to build a tramway to the top of Mount Juneau.

The trustee for the U.S. Bankruptcy Court in Anchorage has recommended that the assets of Keen's Alaska Trams Corp. be declared bankrupt and liquidated.

The corporation filed for protection from creditors under bankruptcy laws in 1986. In a court filing last week, bankruptcy court adviser Barbara Franklin said, "There are no prospects for rehabilitation" of the corporation.

. . . .

Franklin said Keen has been unable to reorganize his company even with protec-

tion, and that he has not filed court-required financial statements or plans to reorganize and get out of bankruptcy.

. . . .

Efforts by Keen to conduct business through Mount Juneau Enterprises are another reason to force Alaska Trams into liquidation bankruptcy, Franklin said in her motion before the bankruptcy court.

Franklin said Keen's effort to use Mount Juneau Enterprises for construction of the tramway terminal is a breach of trust to his creditors.

. . . .

In addition to lack of plans for financial reorganization, Franklin said "the assets of the estate continue to diminish while the expenses of administration continue to increase."

. . . .

Franklin's motion also alleges that Keen transferred property out of the bankruptcy estate without court approval.

In an opposition filed against Franklin's motion, Keen denied transferring land on South Franklin Street to Reliable Transfer Corp. He said Alaska Trams was merely accommodating a neighboring property owner who was trying to clear a land title.

. . . .

According to Keen, progress other than construction has been made on the tram.

"Continual efforts are being made to obtain financing for the entire project, with some apparent success," he told the court in his filing.

His opposition to Franklin's motion includes a copy of a letter of intent for financing of up to $36 million from a Zurich, Switzerland-based investment company—if Alaska Trams comes up with $95,000 for a feasibility study of the project.

Pohl asserted that she relied upon several sources when preparing the bankruptcy article. She spoke with the City's municipal attorney. In addition, the municipal attorney gave her a copy of a liquidation motion which two insurance companies had filed in the bankruptcy proceedings. She also relied upon a joinder to the insurers' motion, filed

by the attorney-advisor to the United States Trustee, for the material attributed to Barbara Franklin.

The article contained some minor inaccuracies.[1] The joinder motion identifies Barbara Franklin as the attorney-advisor to the United States Trustee, not a "bankruptcy court advisor" as the article identifies her. The article also stated that Keen had filed his opposition to Franklin's joinder motion, but actually this opposition was to the insurers' motion.

On September 13, 1990, the Juneau Empire published another article by Pohl that discussed a charge by Keen's counsel that Franklin's joinder motion contained incorrect allegations. The article called Franklin the "trustee," but corrected the September 12 statement that Keen's opposition was to Franklin's report.

On May 14, 1991, an article by Pohl was published under the headline "Goose's Gooey Death." The article discussed a goose that allegedly flew into an abandoned oil tank on Keen's property and landed in sticky fuel residue:

> An abandoned oil tank on South Franklin Street with more than 60,000 gallons of gooey fuel still inside has killed a young goose, and a state environmental official says property owner Chuck Keen has promised to begin cleaning up the site within a week.
>
> A collapsed roof over the fuel tank ... allowed the bird to enter the tank and land in the sticky fuel....
>
> Juneau Raptor Center volunteer Linda Kline said a neighbor told her about the goose Saturday after some children saw it fly into the tank....

> She found the bird ... and took it home to try to wash off some of the oil.
>
> ....
>
> She then took the bird to another raptor center volunteer, who washed it again Sunday afternoon. Later the goose tried to preen itself, "and oil just started pouring out."
>
> The bird died a short time later, Kline said today.
>
> ....
>
> Keen refused comment today on the tank.
>
> ....
>
> In the case of the goose death, Keen could be in violation of the federal Migratory Bird Treaty Act—a felony offense, said U.S. Fish and Wildlife Service biologist Deb Rudis.
>
> ....
>
> The act makes it a felony to kill migratory birds intentionally or accidentally by poisoning, hunting or an oil spill.

This article also contained some inaccuracies. As the Juneau Empire admits, any alleged violation of the Migratory Bird Treaty Act on Keen's part would only be a misdemeanor, not a felony. *See* 16 U.S.C. §§ 703, 707(a) (1988). In addition, Alaska Trams, and not Keen himself, owned the abandoned tank. And finally, though Keen refused to discuss the "gooey goose" matter with Pohl because he considered her biased against him and the tramway project, he was willing to talk with any other reporter from the Juneau Empire.

In June 1991, Mount Juneau Enterprises filed a libel suit against the Juneau Empire.[2]

---

1. In its briefing before this court, Mount Juneau Enterprises cites extensively to Keen's affidavit and to correspondence between Keen and his attorney at the time that the September 12, 1990 article was published. The Juneau Empire argues that the correspondence and the affidavit contain inadmissible hearsay statements which cannot be relied upon to oppose summary judgment.

    We agree. We do not consider any hearsay statements by Keen or Keen's attorney for the truth of the matter. *See Broderick v. King's Way Assembly of God,* 808 P.2d 1211, 1215, 1218 (Alaska 1991) (inadmissible hearsay assertions

cannot be used either to oppose or support a motion for summary judgment). Mount Juneau Enterprises' contention that the Juneau Empire failed to object to this evidence is without merit. At the summary judgment stage, the Juneau Empire expressly objected both to the correspondence between Keen and his lawyer and to the Keen affidavit's hearsay accounts of alleged statements by Linda Kline and Deb Rudis.

2. The complaint also included claims against the City which stemmed from its alleged abandonment of commitments to exchange real property with Mount Juneau Enterprises, to avoid inter-

The complaint alleged that the accounts of Franklin's motion in the bankruptcy matter and the "gooey goose" incident defamed Mount Juneau Enterprises, Alaska Trams, and Keen himself, and that the newspaper acted with malice and negligence in publishing them. Count Fourteen of the complaint alleged that the newspaper "has on many occasions including but not limited to the newspaper articles dated September 12, 199[0] and May 14, 1991 caused to be printed false stories with malicious intent to impede the tramway project and to defame the reputation of the tramway project, [its] financial supporters and the Keen family."

The Juneau Empire subsequently moved for summary judgment. The Juneau Empire supported its motion with an affidavit from Pohl in which she stated that the articles accurately and fairly conveyed the statements in the documents that she researched and the persons whom she interviewed. In her affidavit Pohl also stated that she neither entertained any doubt that the interviewees for the "gooey goose" article were truthful nor intended to hinder the tramway project by publishing the articles.[3]

The superior court granted the Juneau Empire's motion. Determining that Keen was a public figure, the superior court applied the actual malice test as set out in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The superior court concluded that Mount Juneau Enterprises presented no genuine issue of material fact as to whether the Juneau Empire knew its publications to be false or acted with reckless disregard as to their truthfulness. Though the superior court stated that the articles of September 12, 1990 and May 14, 1991 were at issue, the only alleged inaccuracy that it discussed was the misidentification of the bankruptcy advisor in the September 12 article.

The Juneau Empire then filed a motion for attorney's fees pursuant to Alaska Civil Rule 82. The Juneau Empire claimed that it had incurred a total of $52,084.50 in attorney's fees, and supported its motion with an extensive itemization of expenses. Mount Juneau Enterprises opposed the motion contending that it was a public interest litigant and should not be subject to an award of full fees. Mount Juneau Enterprises subsequently moved for an extension of time to file a further opposition as to the alleged inflated figures of the Juneau Empire's bill for attorney's fees.

The superior court issued a memorandum opinion that denied the motion for additional time, rejected Mount Juneau Enterprises' public interest litigant arguments, and awarded the Juneau Empire 60% of its total claimed attorney's fees, or $31,250.70. Mount Juneau Enterprises subsequently moved for reconsideration, and thereby expanded upon its contention that counsel for the Juneau Empire had unreasonably inflated the billing in this case.

In March 1993 the superior court issued a final judgment pursuant to Alaska Civil Rule 54(b) dismissing Mount Juneau Enterprises' complaint against the Juneau Empire with prejudice. In April 1993 the superior court issued a final attorney's fee order which sustained its original award to the Juneau Empire. This appeal followed.

### III. *DISCUSSION*

Mount Juneau Enterprises raises three principal arguments on appeal: (1) that the superior court erred in granting the Juneau Empire's summary judgment motion as to whether Keen was a public figure; (2) that the superior court erred in granting the Juneau Empire's summary judgment motion as to whether the statements at issue were made with actual malice; and (3) that the superior court erred in basing its attorney's

---

fering with the tramway project, and to deal in good faith with the project's financial backers. These claims are not at issue in this appeal.

**3.** The affidavit also contains a statement that Pohl obtained information for the September 12, 1990 bankruptcy article *solely from the insurers'* liquidation motion. In October 1991, after her

deposition testimony, Pohl filed a supplemental affidavit in which she stated that she obtained information for the September 12, 1990 bankruptcy article not only from the insurers' motion but also from Franklin's joinder motion. Pohl did not otherwise change the substance of her earlier affidavit.

fee award on the inflated billings of the Juneau Empire's counsel.

### A. Standard of Review

■■ When reviewing a grant of summary judgment, this court determines whether a genuine issue of material fact exists and whether the moving party is entitled to judgment as a matter of law.[4] *Zeman v. Lufthansa German Airlines*, 699 P.2d 1274, 1280 (Alaska 1985). All reasonable inferences of fact from the proffered evidence must be drawn against the moving party and in favor of the non-moving party. *Id.* Because the actual malice test is subjective, this court must determine "whether there is a genuine issue of material fact on whether [the defendant] entertained serious doubts as to the truth of the statements." *Moffatt*, 751 P.2d at 944; *accord Beard v. Baum*, 796 P.2d 1344, 1353 (Alaska 1990).

■ As to the award of attorney's fees, this court will reverse an award of attorney's fees under Alaska Civil Rule 82 only if the superior court abused its discretion. *Bohna v. Hughes, Thorsness, Gantz, Powell & Brundin*, 828 P.2d 745, 766 (Alaska 1992). An abuse of discretion exists only upon a showing that the award was arbitrary, capricious, manifestly unreasonable, or the result of an improper motive. *Id.* at 766–67.

### B. The Applicability of the Actual Malice Standard

■ In *New York Times Co. v. Sullivan*, the Supreme Court held that the First Amendment of the U.S. Constitution restricts a state's power "to award damages for libel in actions brought by public officials against critics of their official conduct."[5] 376 U.S. at 283, 84 S.Ct. at 727. In order to recover damages for a purportedly defamatory[6] publication related to his official conduct, a public official must prove "that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279–80, 84 S.Ct. at 725–26. The Supreme Court emphasized the chilling effect that common law libel rules would have on the free exchange of ideas:

> A rule compelling the critic of official conduct to guarantee the truth of all his factual assertions—and to do so on pain of libel judgments virtually unlimited in amount—leads to a comparable "self-censorship." Allowance of the defense of truth, with the burden of proving it on the defendant, does not mean that only false speech will be deterred.... Under such a rule, would-be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so.

*Id.* at 279, 84 S.Ct. at 725. To this effect, the Supreme Court reasoned that "erroneous statement is inevitable in free debate, and ... must be protected if the freedoms of expression are to have the 'breathing space' that they 'need ... to survive.'" *Id.* at 271–72, 84 S.Ct. at 721–22.

In *Curtis Publishing Co. v. Butts*, the Supreme Court extended the *New York Times* protections to public figures as well as public

---

4. While the federal courts grant summary judgment in libel cases only where the plaintiff has shown actual malice by clear and convincing evidence or where no reasonable jury could find such actual malice was present, this court continues to apply the standard of review for summary judgment motions pursuant to Alaska Civil Rule 56(c). *Moffatt v. Brown*, 751 P.2d 939, 943 (Alaska 1988) (declining to incorporate the applicable substantive evidentiary standard into this state's summary judgment practice). It is somewhat harder for a libel defendant to win summary judgment in Alaska state courts using the "no genuine issue of material fact" standard than it is in federal court. *Id.* at 944.

5. As applied to the states through the Fourteenth Amendment, the First Amendment prohibits any

law "abridging the freedom of speech, or of the press." U.S. Const. amend. I; *cf.* Alaska Const. art. I, § 5 ("Every person may freely speak, write, and publish on all subjects, being responsible for abuse of that right.").

6. A communication is defamatory if it tends to harm the reputation of another so as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. *See* Restatement (Second) of Torts § 559 (1977); *Green v. Northern Publishing Co.*, 655 P.2d 736, 742 (Alaska 1982), *cert. denied*, 463 U.S. 1208, 103 S.Ct. 3539, 77 L.Ed.2d 1389 (1983).

officials. 388 U.S. 130, 155, 87 S.Ct. 1975, 1991, 18 L.Ed.2d 1094 (1967). However, if the defamation plaintiff is a private individual, then states may apply their own standard of liability so long as they do not impose liability without fault. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347, 94 S.Ct. 2997, 3011, 41 L.Ed.2d 789 (1974).

Thus, if Keen is a public figure, he must prove actual malice in order to recover against the Juneau Empire for libel. This court must therefore determine whether the superior court erred in concluding that Keen was a public figure.

### 1. *The Public Figure Test*

In *Gertz,* the Supreme Court described public figures as follows:

> For the most part those who attain this [public figure] status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment.

*Id.* at 345, 94 S.Ct. at 3009. The Supreme Court further elaborated regarding public figures as follows:

> That designation may rest on either of two alternative bases. In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues.

*Id.* at 351, 94 S.Ct. at 3012. On several occasions, we have applied the *Gertz* public figure test to require application of the actual malice standard in Alaska defamation cases. *Beard,* 796 P.2d at 1353–54; *Rybachek v. Sutton,* 761 P.2d 1013, 1014 (Alaska 1988) (per curiam) (holding that a newspaper columnist who regularly discussed natural resource and mining issues was a public figure

within the limited range of those issues); *Moffatt,* 751 P.2d at 941.

### 2. *The Burden of Proof*

■ Mount Juneau Enterprises contends that the Juneau Empire failed to meet its burden of proof on the public figure issue. The Restatement (Second) of Torts § 580A (1977), which adopts the *New York Times* standard of liability for defamation of public officials or public figures, includes a comment on distinguishing public figures from private individuals:

> The question of whether a plaintiff is a public official or a public figure ... is one of law, not of fact, though the facts on which the determination is to be made may be in dispute and therefore subject to the determination of the fact finder. Where the burden of proof lies as to these facts has not been settled.

*Id.* cmt. c. Emphasizing the comment's remarks in regard to the uncertainty as to the burden of proof and the fact finder's role where facts are in dispute, but without citing to any other case authority, Mount Juneau Enterprises contends that the Juneau Empire should bear the burden of proving that Keen was a public figure because the Juneau Empire seeks the special constitutional protection of the *New York Times* standard. Mount Juneau Enterprises also contends that the Juneau Empire, as the party moving for summary judgment, raised no evidence establishing an absence of genuine issues of material fact on the public figure issue.

Mount Juneau Enterprises is mistaken. The U.S. Supreme Court has stated that "as is the case with questions of privilege generally, it is for the trial judge in the first instance to determine whether the proofs show [a defamation plaintiff] to be a 'public official.'" *Rosenblatt v. Baer,* 383 U.S. 75, 88, 86 S.Ct. 669, 677, 15 L.Ed.2d 597 (1966). The nearly universal rule is that determination of public figure status is a question of law for the court to determine. *E.g., Tavoulareas v. Piro,* 817 F.2d 762, 772 (D.C.Cir.) (en banc), *cert. denied,* 484 U.S. 870, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987); *Rebozo v. Washington Post Co.,* 637 F.2d 375, 379 (5th Cir.), *cert. denied,* 454 U.S. 964, 102 S.Ct. 504, 70 L.Ed.2d 379, 454 U.S. 964, 102 S.Ct.

505, 70 L.Ed.2d 379 (1981); *Reader's Digest Ass'n, Inc. v. Superior Court,* 37 Cal.3d 244, 208 Cal.Rptr. 137, 141–42, 690 P.2d 610, 614– 15 (1984), *cert. denied,* 478 U.S. 1009, 106 S.Ct. 3307, 92 L.Ed.2d 720 (1986); *Knudsen v. Kansas Gas & Elec. Co.,* 248 Kan. 469, 807 P.2d 71, 78 (1991); *Wheeler v. Green,* 286 Or. 99, 593 P.2d 777, 785 n. 7 (1979) (holding that public figure status is a question for the court when the facts are undisputed); *see also Williams v. Pasma,* 202 Mont. 66, 656 P.2d 212, 214–15 (1982) (repudiating earlier Montana authority that had held public figure status to present a jury question under state constitution), *cert. denied,* 461 U.S. 945, 103 S.Ct. 2122, 77 L.Ed.2d 1302 (1983). *But see* Note, *Defining a Public Controversy in the Constitutional Law of Defamation,* 69 Va.L.Rev. 931, 943–44 & n. 75 (1983) (observing that the U.S. Supreme Court · has not expressly addressed the burden of proof in the public figure determination, and suggesting the possibility that the defendant could have this burden).[7]

■ We have held that an evidentiary hearing may sometimes be required in order to determine whether an individual is a public figure, but such a determination may be resolved on summary judgment if the facts relating to public figure status are uncontroverted. *Rybachek,* 761 P.2d at 1014; *accord Rebozo,* 637 F.2d at 379; *see also Rosanova v. Playboy Enter.,* 580 F.2d 859, 862 (5th Cir.1978) ("[W]here undisputed facts admit to but one conclusion, then, on motion for summary judgment, the court properly decides the issue.").

In the case at bar, the facts underlying the superior court's public figure analysis were not disputed. Mount Juneau Enterprises acknowledged in the complaint that it sought to build a tramway, sought City approval for the project, and attempted numerous real property transactions with the City in order to obtain land for the project. The dispute in this appeal pertains not to the validity of these facts but to the legal conclusion that the superior court derived from them. Because no genuine issue of material fact existed, the only issue for the superior court to address was whether the Juneau Empire was entitled to summary judgment as a matter of law.

### 3. *Keen's Public Figure Status as to the Bankruptcy Article*

■ According to Mount Juneau Enterprises, the efforts of Alaska Trams to obtain building permits for the tramway were merely those of "a private party ... trying to build a project which requires building permits, such as that required by any other private building project." Mount Juneau Enterprises contends that by this action Keen did not inject himself into any public controversy and thus did not become a public figure. The superior court rejected this argument:

> [T]his tram project has been going on in the City and Borough of Juneau for a long time. It has involved a lot of public comment, pro and con. There have been a number of hearings. Mr. Keen ... has been in the forefront of the efforts to get the tram project both financed and the necessary permits for it.

A public controversy is not simply a matter of interest to the public, but rather "a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way." *Waldbaum v. Fairchild Publications, Inc.,* 627 F.2d 1287, 1296 (D.C.Cir.), *cert. denied,* 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980); *see also Tavoulareas,* 817 F.2d at 772–73. In order to have voluntarily injected himself or herself into the controversy, the defamation plaintiff "either must have been purposely trying to influence the outcome or could realistically have been expected, because of his position in the controversy, to have an impact on its resolution." *Waldbaum,* 627 F.2d at 1297; *see also* Laurence H. Tribe, *American Constitutional Law* § 12–13, at 881–82 (2d ed. 1988).

Our prior opinions in which defamation plaintiffs were held to be public figures all fit within these guidelines. *See Beard,* 796 P.2d at 1353 (holding that former employee of

---

7. The absence of analysis regarding the burden of proof in public figure determinations has been attributed to the fact that courts treat this question as one of law. Note, *supra,* at 944 n. 76.

state transportation department who brought allegations of departmental corruption to public attention was a public figure as to his job performance given his charges that his termination resulted from his whistle-blowing activities and not from job performance); *Rybachek,* 761 P.2d at 1014 (holding that newspaper columnist on natural resource and mining issues injected herself into public controversy on those issues); *Moffatt,* 751 P.2d at 941 (holding that candidate for state medical board voluntarily placed herself in position of public attention and comment given the strong public interest in a board appointee's qualifications).

Under the above analysis, Keen is a public figure. As the complaint itself alleges, pursuant to the tramway project Alaska Trams purchased property from the City, sought building permits for the tramway, and negotiated ordinances to facilitate a property trade with the City. In this fashion, Keen, in his capacities as president of Alaska Trams and a principal investor in the entity,[8] voluntarily sought public approval of the ambitious tramway project. *See Greenbelt Coop. Publishing Ass'n v. Bresler,* 398 U.S. 6, 8–9, 90 S.Ct. 1537, 1538–40, 26 L.Ed.2d 6 (1970) (holding that real estate developer who was "deeply involved in the development" of the community was a public figure in regard to allegedly defamatory articles on his efforts to obtain a zoning variance and to negotiate land trade with the city).[9] Furthermore, Keen conceded in his opposition to summary judgment that the tramway project was a

matter of public concern. Therefore, we hold that the superior court did not err in concluding that Keen was a public figure.

### 4. The "Gooey Goose" Article and Freedom of Expression on Matters of Public Interest

Mount Juneau Enterprises also argues that because the superior court offered explicit findings only as to the bankruptcy article of September 12, 1990, a remand is necessary for an additional determination on Keen's public figure status concerning the "gooey goose" article of May 14, 1991. Mount Juneau Enterprises is mistaken.

■ Pursuant to this court's defamation decisions the public figure test is not the only route to application of the actual malice standard. We further protect the free exchange of ideas by applying the actual malice standard to publications on issues of public interest and concern, even if the defamation plaintiff is not a public figure:

> On the one hand there is the interest in safeguarding the right to one's reputation. On the other hand there is the interest in allowing freedom of debate and expression on public questions and issues. We believe that a fair balance of these competing interests is achieved where the law of defamation permits one, without liability for damages, to comment, criticize and pass judgment on statements made by another on an issue or matter of public interest, even if such comment, criticism and judg-

---

8. In its appellate brief, Mount Juneau Enterprises cites to Pohl's deposition testimony that she considered Keen and Alaska Trams to be interchangeable, and also notes that the May 1991 *"gooey goose"* article inaccurately named Keen, not Alaska Trams, as the owner of the oil tank. However, Mount Juneau Enterprises does not argue that Keen avoided public figure status merely by pursuing his business venture through the corporate form.

9. In support of its argument that the allegedly defamed parties were not public figures, Mount Juneau Enterprises relies upon *Time, Inc. v. Firestone,* 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976). The *Firestone* court held that a prominent socialite's judicial divorce proceedings did not make her a public figure, in part because she had no choice but to resort to the courts in order to obtain the divorce. *Id.* at 454–55, 96 S.Ct. at

965–66. Mount Juneau Enterprises contends that similarly, neither Alaska Trams' bankruptcy proceedings nor its efforts to obtain required building permits from the City make Keen a public figure.

*Firestone* is distinguishable. The *Firestone* court held that judicial dissolution of a marriage did not constitute the sort of public controversy that mandated treating the spouses as public figures. *Id.* Contrary to the implication of Mount Juneau Enterprises, *Firestone* did not create a bright-line rule erasing an individual's public figure status merely because he or she was required to participate in government proceedings. *Cf.* Tribe, *supra,* § 12–13, at 881 (proposing that the reasoning for *Firestone* is not so much the fact that people must use courts to get divorces as that "the *Firestone* majority decided that gossip about the rich and famous is not a matter of legitimate public interest").

ment involves misstatements of fact—so long as such misstatements are relevant to the subject matter spoken or written about by the one claiming to be defamed and are not shown by him to have been made with actual malice.

*Pearson v. Fairbanks Publishing Co.,* 413 P.2d 711, 713 (Alaska 1966); *see also Gay v. Williams,* 486 F.Supp. 12, 16–17 (D.Alaska 1979); *Schneider v. Pay'N Save Corp.,* 723 P.2d 619, 623–24 (Alaska 1986); *Doe v. Alaska Superior Court,* 721 P.2d 617, 627–28 (Alaska 1986); *West v. Northern Publishing Co.,* 487 P.2d 1304, 1305–06 (Alaska 1971).

■ Assuming *arguendo* that Keen was not a public figure for the purposes of the "gooey goose" article, the actual malice standard applies nonetheless, because the subject of the article concerned matters of public interest. Keen does not dispute that the property on which the oil tank was located was originally purchased for the purpose of the tramway project. In addition, cleanup of the hazardous materials on the site poses an additional issue of public interest. Therefore, under the *Pearson* test, we hold that the actual malice standard applies to the "gooey goose" article, and that this issue need not be remanded to the superior court for additional findings.

### C. *Liability of the Juneau Empire Under the Actual Malice Standard*

Mount Juneau Enterprises further contends that genuine issues of material fact existed as to whether the Juneau Empire acted with malice in publishing the articles of September 12, 1990 and May 14, 1991. This contention may be divided into two subarguments: that the superior court improperly placed excessive reliance on Pohl's testimony, and that the superior court failed to consider the Juneau Empire's failure to publish retractions.

In order to show a defendant's reckless disregard for truth or falsity of published material, the plaintiff in a defamation case must present "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262

(1968); *accord Moffatt,* 751 P.2d at 941–42; *see also Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 511, 111 S.Ct. 2419, 2430, 115 L.Ed.2d 447 (1991). Accordingly, application of the actual malice standard focuses on the defendant's subjective intent. *See Moffatt,* 751 P.2d at 944; *Green,* 655 P.2d at 742. The superior court correctly concluded that neither Pohl nor anyone else from the Juneau Empire acknowledged any reason to doubt the truth of what they printed. On appeal, Mount Juneau Enterprises offers no record evidence that any member of the Juneau Empire staff subjectively entertained any doubt as to the truthfulness of the articles at issue.

■ Instead, Mount Juneau Enterprises points to perceived inadequacies in the Juneau Empire's preparation of the articles:

[T]here was evidence adduced before the court through the deposition testimony that Jeanine Pohl only reported one side of the issue; that Jeanine Pohl relied primarily upon people with ulterior motives or bias against the appellants; that Jeanine Pohl was not ever told by anyone at *The Juneau Empire* to check her facts before writing stories; that she conducted a grossly inadequate investigation; that she was given this assignment despite a lack of training or understanding of legal matters; that she assumes without question, whatever people tell her is "true"; that there was no rush or deadline on this case, and thus no reason for failing to adequately investigate and ascertain the true facts before publishing the article....

Assuming *arguendo* that these contentions are true, they alone do not establish actual malice. Failure to make a prior investigation into the accuracy of published statements does not itself "constitute[ ] proof sufficient to present a jury question whether the statements were published with reckless disregard of whether they were false or not." *Beckley Newspapers Corp. v. Hanks,* 389 U.S. 81, 84–85, 88 S.Ct. 197, 199–200, 19 L.Ed.2d 248 (1967); *accord St. Amant,* 390 U.S. at 733, 88 S.Ct. at 1326; *Tavoulareas,* 817 F.2d at 797–98; *see also Gay* 486 F.Supp. at 16–17 (declining to find actual

malice where local newspaper printed release from national wire service without independent investigation of the article's accuracy). Reckless disregard "is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing." *St. Amant,* 390 U.S. at 731, 88 S.Ct. at 1325. The U.S. Supreme Court has also stated that "a public figure plaintiff must prove more than an extreme departure from professional standards and that a newspaper's motive in publishing a story—whether to promote an opponent's candidacy or to increase its circulation—cannot provide a sufficient basis for finding actual malice." *Harte-Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 665, 109 S.Ct. 2678, 2685, 105 L.Ed.2d 562 (1989). One commentator accordingly has concluded that "recklessness may not be inferred from a publisher's failure to inquire into a matter's truth or falsity, although a responsible reporter might well have inquired." Tribe, *supra,* § 12–12, at 871.

■■■ As Mount Juneau Enterprises correctly notes, the testimony of the defendant alone is not always sufficient to establish an absence of actual malice. *Moffatt,* 751 P.2d at 941–42 (quoting *St. Amant,* 390 U.S. at 732, 88 S.Ct. at 1326). However, Mount Juneau Enterprises' reliance on this language is futile. In *Moffatt* we articulated a test to determine when the defendant's testimony alone is sufficient to counter a claim of actual malice:

> The defendant's testimony that he published the statement in good faith should be sufficient to counter a claim of actual malice when (1) the plaintiff has failed to present conflicting evidence, and (2) the circumstances do not indicate that the statement was "fabricated by the defendant, ... the product of his imagination, ... based wholly on an unverified anonymous telephone call ... [or] so inherently improbable that only a reckless man would have put them in circulation."

*Moffatt,* 751 P.2d at 946 (quoting *St. Amant,* 390 U.S. at 732, 88 S.Ct. at 1326) (alterations in original). Mount Juneau Enterprises presents *no* evidence indicating that the Juneau Empire fabricated the articles at issue,

created them from imagination, based them on an anonymous phone call, or could consider them inherently improbable.

Indeed, the circumstances of this case resemble those of *Time, Inc. v. Pape,* 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971), the case on which the superior court relied. There, *Time* magazine, quoting from a report by the U.S. Commission on Civil Rights, described an account of a police detective's purported mistreatment of an African–American resident of Chicago, but failed to indicate that this account was based upon the resident's complaint and not upon the Commission's independent findings. The U.S. Supreme Court declined to find actual malice sufficient to sustain the detective's defamation claim because the magazine's omission of language that would qualify the material as an allegation constituted "the adoption of one of a number of possible rational interpretations of a document that bristled with ambiguities." *Id.* at 290, 91 S.Ct. at 639; *see also Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 512–13, 104 S.Ct. 1949, 1966–67, 80 L.Ed.2d 502 (1984). The Supreme Court concluded that to find actual malice in that case would apply a far stricter standard of liability on errors of interpretation than on errors of fact. *Pape,* 401 U.S. at 290, 91 S.Ct. at 639. Application of such a standard would have created the same concerns of self-censorship that caused the Supreme Court to fashion the *New York Times* rule:

> These considerations apply with even greater force to the situation where the alleged libel consists in the claimed misinterpretation of the gist of a lengthy government document. Where the document reported on is so ambiguous as this one was, it is hard to imagine a test of "truth" that would not put the publisher virtually at the mercy of the unguided discretion of a jury.

*Id.* at 291, 91 S.Ct. at 640.

Similarly, one of Mount Juneau Enterprises' principal complaints is that Pohl misidentified Barbara Franklin, the attorney-advisor to the U.S. Trustee in the Alaska Trams bankruptcy proceeding, as the bankruptcy trustee. However, Franklin's motion paper-

work presents her title in such a fashion that a lay person could easily misconstrue the term "United States Trustee" to mean "bankruptcy trustee." *Pape*'s holding was designed to protect publishers who make minor mistakes in construing documents that because of their ambiguity could be misconstrued by lay persons. The misidentification of Franklin is one of those mistakes. Therefore, we hold that the superior court's determination that there was no genuine issue of material fact as to whether the articles were published with actual malice should be sustained.[10]

■ Mount Juneau Enterprises also contends that the Juneau Empire's failure to retract raised an inference of actual malice which precluded summary judgment. We disagree. If a refusal to retract alone created a genuine issue of fact, then a defamation plaintiff could avoid summary judgment by making a self-serving demand to retract before filing suit, and the possibility of summary judgment in a defamation case would be virtually nonexistent.

Mount Juneau Enterprises' reliance on *Golden Bear Distributing Systems of Texas, Inc. v. Chase Revel, Inc.*, 708 F.2d 944 (5th Cir.1983), and *Holbrook v. Casazza*, 204 Conn. 336, 528 A.2d 774 (1987), *cert. denied*, 484 U.S. 1006, 108 S.Ct. 699, 98 L.Ed.2d 651 (1988), is not helpful here.[11] As the Juneau Empire correctly notes, both cases "involved a plaintiff who was accused of wrongdoing in terms sufficiently factual to be susceptible of being proved true or false, who demonstrated to the publisher the falsity of the publication, yet the publisher refused to retract." *See*

*Golden Bear*, 708 F.2d at 950; *Holbrook*, 528 A.2d at 780. *Golden Bear* involved a magazine article that impliedly imputed to the plaintiff firm the fraud of a different company, with the same name, located in another state. 708 F.2d at 946–47. Furthermore, the refusal to retract occurred in circumstances where other evidence clearly indicated actual malice: The defendants knew at the time of publication that specific facts were false. *Id.* at 950. *Holbrook* involved a defendant's refusal to retract an accusation of wrongdoing against the plaintiff, even after the plaintiff obtained a second official exoneration of the purported improprieties. 528 A.2d at 780. By contrast, the material of concern to Mount Juneau Enterprises merely reproduced or paraphrased the statements of third parties, and did not embrace the positions of those individuals.

In sum, Mount Juneau Enterprises did not present evidence of actual malice sufficient to create a genuine issue of material fact and thus survive the Juneau Empire's motion for summary judgment both as to the bankruptcy article and the "gooey goose" article. We thus conclude that the superior court properly granted summary judgment in favor of the Juneau Empire on this issue.[12]

### D. The Award of Attorney's Fees

■ Finally, Mount Juneau Enterprises contends that the superior court's award of 60% of attorney's fees was improper. There are two prongs to this argument: that the superior court improperly punished Mount Juneau Enterprises for conducting discovery, and that counsel for the Juneau Empire had

---

10. The "gooey goose" article doesn't accuse Keen of committing a felony. It does contain a mistaken statement by a third party that the accidental killing, by oil contamination, of migratory birds was a felony under the Migratory Bird Treaty Act. A lay person could reasonably rely on a U.S. Fish and Wildlife Service biologist's statement that a potential felony offense was implicated under the Act.

11. Mount Juneau Enterprises in part relies on the panel decision in *Tavoulareas v. Piro*, 763 F.2d 1472 (D.C.Cir.1985) to support this argument. The *Tavoulareas* panel decision is not persuasive authority. The Circuit for the District of Columbia subsequently granted rehearing of this case en banc, *id.* at 1481, vacated the panel

decision, *id.*, and issued a new opinion rejecting the analysis of the panel. *See Tavoulareas v. Piro*, 817 F.2d 762 (D.C.Cir.1987) (en banc).

12. In the alternative, the Juneau Empire contends that the articles at issue enjoyed immunity under the "neutral reportage" doctrine, were constitutionally protected opinion, or were incapable of defamatory interpretation. Additionally, the Juneau Empire argues that the bankruptcy article enjoyed an absolute privilege for the truthful reporting of judicial proceedings. In light of our disposition of this case, we need not reach these other issues. Although we do note that the bankruptcy article in question here is in essence truthful.

inflated the total bill from which the partial fee award was calculated.

The superior court held that much of the Juneau Empire's bill for legal services stemmed from the time required for the extensive discovery on which Mount Juneau Enterprises insisted:

> In this case, the issues were not particularly complex, and plaintiff's claim was never particularly strong. Nevertheless, plaintiff insisted on a lengthy continuance and a significant amount of discovery (which was of minimal assistance in resolving the summary judgment issue). Thus a significant amount of the Empire's fees is the result of plaintiff's own conduct.
>
> . . . .
>
> As a sort of benchmark, this court considers 50% of attorney fees as a good place to start. . . . In this case, attorney fees at 60% of the amount billed . . . are reasonable given the unreasonable discovery undertaken by plaintiffs on the summary judgment motion.

Mount Juneau Enterprises does not directly challenge the determination that discovery was unreasonable, but instead contends, without citation to authority, that the voluminous discovery in this case was necessary given the difficulty that a defamation plaintiff has in meeting the *New York Times* actual malice standard. This contention does not raise an abuse of discretion by the superior court because such an argument does not adequately address the finding that most of the discovery in this case was unnecessary.

Furthermore, Mount Juneau Enterprises offers little support for the argument that the Juneau Empire's attorneys inflated their bills. Essentially, Mount Juneau Enterprises argues that the portion of the attorneys' time taken up with discovery was not excessive, invites this court to speculate on the amount of legal research that the Juneau Empire's counsel had to perform in order to prepare this case, and implies that conferences among the firm's attorneys are not a proper part of the research process. None of these arguments have merit, nor do they point to an abuse of discretion on the superior court's part. Therefore, we affirm the award of attorney's fees.

## IV. CONCLUSION

Because Keen is a public figure, at a minimum for the purpose of the bankruptcy article of September 12, 1990, and because both the article of September 12, 1990 and the "gooey goose" article of May 14, 1991 addressed matters of public interest and concern, we hold that the actual malice standard applies. Furthermore, we hold that Mount Juneau Enterprises failed to present evidence of actual malice at the summary judgment stage as to either the bankruptcy article or the "gooey goose" article. Finally, we hold that the superior court's award of attorney's fees to the Juneau Empire was not an abuse of discretion.

AFFIRMED.