STATE of Alaska, Caroline Venusti and
William McMullen, Appellants and
Cross–Appellees,

v.

Burle S. BEARD, Appellee
and Cross–Appellant.

Nos. S–6378, S–6438.

Supreme Court of Alaska.

May 29, 1998.

**2**

Randy M. Olsen, Assistant Attorney General, Fairbanks, and Bruce M. Botelho, Attorney General, Juneau, for Appellants and Cross–Appellees.

Thomas R. Wickwire, Fairbanks, for Appellee and Cross–Appellant.

Before COMPTON, C.J., and RABINOWITZ, MATTHEWS and EASTAUGH, JJ.

*OPINION*

EASTAUGH, Justice.

## I. INTRODUCTION

This is the third appeal involving Burle Beard's claims against the State of Alaska and several State employees. *See Beard v. Baum*, 796 P.2d 1344 (Alaska 1990) (*Beard I* ); *Cameron v. Beard*, 864 P.2d 538 (Alaska 1993) (*Beard II* ). In *Beard II*, we remanded for an evidentiary hearing to determine whether Beard's failure to exhaust his administrative remedies barred his claims. The superior court excused Beard's failure to exhaust. The State and the individual defendants now appeal this ruling (and others). Beard's consolidated cross-appeal argues that the State's agreement to indemnify the individual defendants violates public policy. Concluding that Beard failed to exhaust his administrative remedies, we reverse.

## II. FACTS AND PROCEEDINGS

We have previously detailed the events which culminated in Beard's lawsuit. *See Beard I*, 796 P.2d at 1347–48; *Beard II*, 864 P.2d at 540–44. In *Beard I*, we held, *inter alia*, that the superior court erroneously dismissed Beard's claims against the State defendants for failing to exhaust the remedies available under his collective bargaining agreement (CBA). *Beard I*, 796 P.2d at 1349. We observed:

> [Bruce Senkow, Beard's union representative, stated in an affidavit submitted to the court] that Beard had complained to him that his supervisors were harassing him to make his work environment intolerable. Senkow told Beard that he could not pursue the grievance because the actions Beard complained of fell under management's prerogative under Article 5 of the CBA. Under the CBA grievance procedures, Beard could not pursue his grievance past the initial steps without the cooperation of an APEA [Alaska Public Employees Association] representative.

*Id.*

On remand, the State defendants moved for summary judgment on the exhaustion issue. They based their motion on Bruce Senkow's February 1991 deposition testimony which allegedly contradicted his earlier affidavit. *Beard II*, 864 P.2d at 543. The superior court denied this motion, and other pending defense summary judgment motions, stating generally that "there are factual issues to be resolved." *Id.* Nonetheless, the court agreed to hear oral argument on the exhaustion issue if Beard prevailed at trial. *Id.*

At trial, the jury returned a $696,571 verdict for Beard. *Beard II*, 864 P.2d at 544. The individual defendants, William McMullen, Caroline Venusti, and Harold Cameron, were each assessed compensatory damages of $1,000 for intentional infliction of emotional distress. *Id.* Another individual defendant, Sharon McLeod, was found not liable for compensatory damages, but was assessed punitive damages of $1,000. *Id.* The jury also awarded Beard punitive damages against McMullen ($70,000), Venusti ($45,000), and Cameron ($45,000). *Id.*

After the jury returned the verdict for Beard, the superior court ruled that our *Beard I* decision had rendered the exhaustion issue res judicata. *Beard II*, 864 P.2d at 544. The superior court entered judgment for Beard.

The defendants appealed. They challenged various superior court rulings, including its decision on exhaustion. *Beard II*, 864 P.2d at 540. We held in *Beard II* that *Beard I* had not conclusively resolved this question, and remanded.

The superior court erroneously interpreted our decision in *Beard I* as conclusively deciding the exhaustion issue. Our decision merely reversed the court's ruling in favor of the State and did not constitute a final determination that Beard was excused from pursuing his remedies under the collective bargaining agreement. Beard never sought summary judgment on this issue and the State never had an opportunity to rebut the evidence presented in Beard's opposition. The doctrine of res judicata does not apply when one party has not had an opportunity to litigate an issue. We therefore remand this issue to the superior court for an evidentiary hearing.

*Beard II*, 864 P.2d at 545 (citations omitted).

At the remand hearing, Senkow testified that he was very familiar with Beard's grievance history because he had helped Beard process five separate grievances while Beard was employed with DOT. According to Senkow, he had no significant contact with Beard during the summer of 1986, although Beard contacted him in May about a supervisor's request for a sick-leave slip, and at least one of Beard's grievances was pending. Senkow testified that Beard never told him that he was going to quit because his work conditions were intolerable or because his firing was imminent. Senkow also testified that his May 15, 1987, affidavit referred to conversations he had with Beard earlier in the year.

Beard's attorney cross-examined Senkow about his 1991 deposition, where he had testified that he had never considered Beard's work problems to be related or advised Beard to consider a constructive discharge claim. Senkow reiterated his view that Beard's complaints concerning work assignments, sick-leave slips, and "cold-shouldering" were not grievable. He also testified that he did not see a pattern in the complaints Beard brought to him.

Q: [by Beard's attorney] Your belief that you can't grieve a year's worth of pattern is consistent with why you didn't grieve the pattern; right?

A: No, that's not correct. That's not consistent. In the context of that deposition and what I was answering at that point, you know—normally when somebody gets disciplined, there's been progressive discipline. That in itself is a pattern. We grieve—we grieve that. So we do grieve a pattern. I mean, we grieve the whole process of progressive discipline. So, I mean, you know, I know we can grieve the whole disciplinary area. That includes investigations and written warnings, suspension, and ultimately termination.

Q: Right. But your statement there that you can't grieve a pattern, you have to grieve an incident. And your testimony we went over. But Mr. Beard wanted to lump these all together and you wanted to keep them all separate.

A: I don't know what....

Q: Those are all consistent with your affidavit....

A: I don't know at what point....

Q: ... that says he told you about those and you didn't think you could grieve them. Right?

A: I don't know at what point Beard asked me to grieve a pattern. I don't even know if he did. I don't believe he ever did.

I treated those incidents all separately because that's the way they came in. There was no pattern to those.

On re-direct, Senkow stated that Beard was familiar with union procedures and that Beard had appealed Senkow's refusal to grieve a March 1986 warning letter to the grievance committee. He also testified that he was unaware that Beard's problems at work were affecting his health. Finally, Senkow reiterated that he would have filed a constructive discharge grievance if Beard had asked him to do so.

Evie Seymore testified that she had been present during at least two of Beard's meetings with Senkow, at which Senkow had refused to grieve various issues.

I know in one meeting, he talked about the harassment of having to write down his times at work where he had to keep track of his time by hours and write it down. I know he talked about having to submit a sick leave form where no one else in the office has ever had to submit one. And I know he talked to him about he was not given any real work to do, he was basically given very little work. Burle [Beard] was bored and preferred to be working as opposed to sitting there doing nothing. And Bruce [Senkow] said, well, these were all things that he didn't consider as harassment at all, that they were prerogatives of the management. So he wouldn't do anything about them.

. . . .

. . . Each time he managed to get Bruce to finally proceed with [a grievance], they were overturned. But he kept trying to tell Bruce, there's a pattern here. This is happening, this is happening, this is happening, this is happening. But Bruce would only deal with one thing at a time and not perceive it as a pattern.

She also testified that Beard had told Senkow that the situation at DOT was causing him a great deal of stress.

During cross-examination by Beard's attorney, Senkow testified that after quitting, Beard asked Senkow to grieve his final evaluation, and nothing else. As Beard requested, Senkow grieved the final evaluation.

At the close of the hearing, the superior court ruled that the union knew or should have known that Beard wanted to grieve his overall work situation at DOT even though Beard did not use the specific term "constructive discharge."

The Court finds that the union did not in fact present a grievance to take into account [the] overall context of what was occurring. It's sufficiently clear to the Court that in Mr. Beard's contact with the union, it should have been clear to the union what Mr. Beard wanted. And that was basically to stop the harassment and [present] him an acceptable work place.

As even the testimony of Mr. Senkow indicates, he was fighting the individual battles one at a time and doing well and winning the battles. But they lost sight of the fact that the war was not being waged. Mr. Senkow's affidavit, the original affidavit is pretty clear in the sense that we are not going to arbitrate or grieve the overall situation because it's not grievable. His subsequent testimony is in a different light, in a different context. At the time these events were occurring, it's clear that with respect to many of the—it's the overall course of conduct we're dealing with, not a specific event, that there was a factual inconsistency in evaluation. The fact that he was being shunned by the people at DOT, the fact that he was being assigned this and that, although not grievable, certainly was part of the overall factual situation that led to his ultimate termination.

The Court specifically finds that it should have been sufficiently clear to the union that Mr. Beard wanted to correct his intolerable situation at DOT. They did not proceed to represent him in connection with that.

The court also ruled that even if the union had been willing to assist Beard in filing a grievance on these matters, such efforts would have been futile.

[E]ven if a grievance had been filed on that based on what had occurred in connection with the factual information that occurred at trial as well as the jury verdict, any grievance concerning his work situation,

any grievance concerning his termination would have been entirely futile. Even if he had won the grievance and gone back to work, the situation still would not have been corrected. He might have won the grievance, but he still would not have won the war.

Following post-hearing rulings on other issues, the State, Venusti, and McMullen appealed. Beard cross-appealed.

## III. DISCUSSION

### A. Exhaustion of Administrative Remedies

■ We have repeatedly held that employees must first exhaust their contractual or administrative remedies, or show that they are excused from doing so, before they may pursue direct judicial actions against their employers. *See, e.g., Beard II,* 864 P.2d at 545. *See also Voigt v. Snowden,* 923 P.2d 778, 781–83 (Alaska 1996). This policy "promotes judicial efficiency by affording an institution an opportunity to correct its own errors, so as to render judicial action unnecessary." *Eidelson v. Archer,* 645 P.2d 171, 181 (Alaska 1982). *See also Eufemio v. Kodiak Island Hosp.,* 837 P.2d 95, 99 (Alaska 1992) (doctrine of exhaustion of remedies also encourages the development of a factual record and discourages the "deliberate flouting of its processes"). However, an employee may be excused from exhausting administrative remedies if the administrative process is tainted or biased, *Eidelson,* 645 P.2d at 179–83, or if the employee's union refuses to participate in the grievance process. *Beard I,* 796 P.2d at 1348–49; *Casey v. City of Fairbanks,* 670 P.2d 1133, 1136–37 (Alaska 1983).

The superior court ruled as follows on remand:

The Court finds, number one, that the union was certainly put on notice and was put on notice of what the intolerable situation of Mr. Beard was with respect to the work. That the union did not grieve that aspect of the situation. And number two, even if there was—he failed to present sufficient information to the union so that they were on notice of what he wanted

them to do, it would have been futile to grieve that aspect and it's therefore excused.

On appeal, the State asserts that the superior court's ruling is both factually and legally flawed. First, the State asserts that the evidence presented at the remand hearing does not support the court's finding that the union "knew or should have known" that Beard felt his working conditions at DOT were intolerable at the time he resigned. Second, the State argues that this court's decision in *Casey* requires, at a minimum, that the employee establish that the union explicitly refused to grieve a complaint before the employee can be excused from pursuing administrative remedies. Finally, the State asserts that the superior court misapplied *Casey* in ruling that futility excused Beard from exhausting his administrative remedies.

### 1. Standard of review

■ It is within the superior court's discretion to determine whether a particular employee has exhausted the administrative remedies available. *Eufemio v. Kodiak Island Hosp.,* 837 P.2d 95, 98 (Alaska 1992). This court will reverse a ruling for abuse of discretion only when "left with a definite and firm conviction, after reviewing the whole record, that the trial court erred in its ruling." *Id.* (quoting *Morgan v. State, Dep't of Revenue,* 813 P.2d 295, 297 n. 4 (Alaska 1991)).

■ We will review the superior court's conclusions of law using our independent judgment. *Pederson–Szafran v. Baily,* 837 P.2d 124, 127 n. 1 (Alaska 1992). The superior court's factual findings will only be reversed if "clearly erroneous." *City of Hydaburg v. Hydaburg Co-op. Ass'n,* 858 P.2d 1131, 1135 (Alaska 1993).

### 2. Refusal to grieve

■ An employee may be excused from exhausting administrative remedies if the union refuses to process the employee's grievance. *Casey,* 670 P.2d at 1135. In that case, a former building inspector sued the City of Fairbanks for wrongful discharge. The su-

perior court granted summary judgment to the City, ruling that Casey had failed to exhaust his administrative remedies. *Id.* In reversing this ruling, we observed that Casey could not have pursued his grievance without the assistance of his shop steward or supervisor and that those individuals had refused to help him. *Id.* at 1136–37. Therefore we concluded "as a matter of law that Casey made a good faith effort to pursue his grievance. Any further action that Casey could have taken was excused because it would have been futile." *Id.* at 1137.

A majority of jurisdictions have held that a union's refusal to pursue an employee's grievance will excuse the employee's failure to exhaust where

> the union has sole power under the contract to invoke the higher levels of the grievance procedure *and* if the union has prevented the employee from exhausting his remedies by its wrongful refusal to process the grievance.

*Croston v. Burlington N.R. Co.,* 999 F.2d 381, 386 (9th Cir.1993) (emphasis in original) (citation omitted); *see also Vaca v. Sipes,* 386 U.S. 171, 185–86, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); *Thompson v. Modernfold Indus.,* 175 Ind.App. 686, 373 N.E.2d 916, 919 (1978); *Gilstrap v. Mitchell Bros. Truck Lines,* 270 Or. 599, 529 P.2d 370, 374–76 (1974). Most courts have equated a "wrongful refusal" to process a grievance with a breach of the union's duty of fair representation. *See Thompson,* 373 N.E.2d at 923 (holding that a union breaches its duty of fair representation by conduct which is "arbitrary, discriminatory or in bad faith"); *Gilstrap,* 529 P.2d at 375 (holding that a union has a duty to protect an employee's rights in good faith and in a nonarbitrary manner).

In this case, the superior court found that based on Beard's contacts with Senkow, the union knew or should have known that Beard wished to grieve his overall work situation and that the union failed to file such a grievance. Like Casey, Beard needed the cooperation of a union representative to process a grievance past the initial steps.[1] Finding that the union failed to grieve, the superior court concluded that Beard was excused from exhausting his administrative remedies. The State asserts that this finding is both clearly erroneous and an improper extension of *Casey.*[2]

Our review of the record leads us to conclude that the superior court erred in determining that Beard is excused from exhausting his remedies. The record suggests that up until mid-May 1986, about three months before he quit, Beard tried to resolve his work conditions through the available grievance procedures. *See Casey,* 670 P.2d at 1136 (holding that employee had made a "good faith" effort to pursue his grievance where the individuals required to process his grievance refused to process an employee's complaint). Beard grieved several incidents either on his own or with the union's help in the twelve months before his resignation. At the time he resigned, the union was still processing at least two grievances. The union, through its representative, Senkow, had refused to grieve several of Beard's complaints. Both Senkow's affidavit and his testimony at the hearing indicate that Beard asked Senkow to grieve various aspects of his work environment, but that Senkow told him that such matters were not grievable since these actions might be considered management prerogative.[3] For example, Senkow

---

1. Article 10 of the CBA provided for the processing of grievances or "any controversy or dispute arising between ... an Employee ... and the Employer." The CBA outlined a five-step process concluding with arbitration. The CBA specified that "GRIEVANCES AT STEP THREE AND BEYOND MUST BE PROCESSED THROUGH APEA BUSINESS REPRESENTATIVES."

2. The State does not argue that a test other than that announced and applied in *Casey* should apply here or that we should reconsider *Casey.* It is consequently not necessary in this case to

reach the issues discussed in the concurring opinion.

3. Senkow affied:

> Mixed in with my discussions with Mr. Beard were his complaints that one or more of his supervisors were trying to harass him by using work assignments, apportioning the workload and otherwise structuring his work environment so as to make it as uncomfortable as possible. I explained to him that this is not a grievable matter as it is not provable by the correspondence and personnel file documents

refused to grieve Beard's complaint about a supervisor who had required Beard to justify his use of sick leave in May 1986. Seymore's testimony also indicates that Senkow refused to grieve two of Beard's complaints, including his complaint that his supervisors forced him to keep detailed time sheets and avoided assigning work to him. Seymore also testified that Senkow refused to see a "pattern" in the conduct of Beard's supervisors.

Nonetheless, Beard last asked the union to grieve his work conditions several months before he resigned. (He last sought union assistance concerning work conditions in May 1986, and resigned on August 22, 1986.[4]) Following termination, Beard did not renew any earlier request that the union grieve a pattern and did not ask the union to grieve his resignation as a termination or constructive discharge. His only post-termination grievance request related to the "bad" final evaluation, not work conditions. Senkow testified that he would have filed a constructive discharge grievance had Beard asked him to do so. Because Beard never asked the union to grieve his departure from office, the union was never given a chance to participate in the grievance process with respect to Beard's resignation. *See Casey*, 670 P.2d at 1136–37.

■ Where an ongoing pattern of harassment in the workplace culminates in an employee's resignation, the employee must attempt to grieve this involuntary termination even if the union has previously been unresponsive to the employee's complaints of harassment. In other words, the union must be afforded a reasonable opportunity to represent the employee, and the employer must be given an opportunity to remedy any wrongs through non-judicial means. To hold otherwise would undermine this court's strong policy favoring the resolution of labor disputes through administrative procedures.

Given the facts, we hold that the superior court's findings that Beard made a good faith effort to file grievances and that the union did not support him in his effort were clearly erroneous with respect to an incipient constructive discharge claim. We therefore hold that the superior court abused its discretion in ruling that Beard's failure to exhaust his administrative remedies was excused under *Casey*.

### 3. Futility

■ The superior court reasoned that even if Beard had exhausted his remedies and filed and won a grievance and gone back to work, the "situation still would not have been corrected. He might have won the grievance, but he would not have won the war."

We cannot conclude that a successful grievance would have provided Beard with a remedy so inadequate as to render futile his pursuit of the grievance procedure. Had Beard successfully grieved a constructive discharge, he would have been entitled to reinstatement with back pay. Even if we assume that reinstatement would have returned him to the same unsatisfactory environment, recovery of back pay for the period he was off work would nonetheless have given him a substantial remedy and would also have tended to discourage further harassing conduct by supervisors. Continued harassment would presumably have led to further successful grievances, up to and including another successful constructive discharge claim, leaving the State with the prospect of having a vacant position in the

and is, on its face, one of those areas that is left to management prerogative.

4. Beard claimed that his work conditions amounted to supervisor harassment. In *Beard I* we held that evidence of the Union's failure to grieve what Beard claimed was a pattern of harassment excused his failure to grieve his constructive termination claim, requiring that the summary judgment entered for defendants be set aside. 796 P.2d at 1349. In *Beard II* we remanded for determination of whether Beard's failure to grieve was excused. 864 P.2d at 545. We assumed in both opinions that evidence of

Union refusal to grieve claims of harassing work conditions was relevant to whether Beard was excused from asking the Union to grieve a claim that those conditions forced him to resign. Only upon remand following *Beard II* was the disputed futility issue tried with full opportunity to offer evidence on whether a pre-resignation refusal to grieve particular complaints of harassing conduct excused Beard from failing to ask the Union after he resigned to file a grievance that would have claimed that harassing conduct forced him to quit.

interim, or potentially paying both a salary to a replacement employee and back pay to Beard. The record reflects that Beard's collective bargaining agreement contained a five-step grievance process culminating in binding arbitration. Article 10, section 2, paragraph 3 of the CBA states: "The arbitrator shall have the power to return a grievant to employee status with or without restoration of back pay, or mitigate the penalty as equity suggests under the facts." There was no evidence reinstatement with back pay was beyond the authority of the arbitrator. Further, the record reflects that Beard had successfully used the grievance process in the past. Senkow testified that he had processed five grievances for Beard and was successful in each case. The demonstrated success of the grievance process on those occasions refutes any argument that the grievance process was doomed to failure. In the absence of evidence that reinstatement and a monetary remedy were not available administratively, the superior court's conclusion of futility is wrong as a matter of law.

We also note that the superior court's decision makes a fundamental assumption about something that should not be assumed: that the arbitrator could not have provided an adequate remedy. Article 10, section 1 of the CBA extends the agreement to "any ... controversy or dispute having occasion to arise between the parties." Article 10, section 7 stipulates that "the arbitrator shall

have the authority to rule on arbitrability issues...." In the first instance, it was the arbitrator who had the authority and responsibility to determine the scope of the arbitrator's powers. Beard cannot base his futility argument on the theory the CBA did not allow the remedy he seeks when it was his failure to exhaust which prevented an arbitrator from deciding whether that remedy was administratively available. Because the CBA itself did not prevent the arbitrator from fashioning an adequate remedy, Beard cannot assert futility as an excuse for failing to exhaust his administrative remedies.

4. *Claims against McMullen and Venusti*

■■■ McMullen and Venusti argue that the superior court should have dismissed the claims against them as individual defendants because Beard did not exhaust his administrative remedies. They assert that the conduct Beard complains of was subject to the CBA grievance process. Beard's appellate briefs filed in this appeal and in *Beard I* and *Beard II* did not argue that the intentional infliction of emotional distress (IIED) claims were not subject to the CBA grievance requirements. Nor did Beard's briefs in the three appeals assert that an unexcused failure to exhaust that would bar his claims against the State would not also bar his IIED and constructive discharge claims against Venusti and McMullen.[5]

5. McMullen, Venusti, and the State moved to dismiss Beard's IIED and constructive discharge claims for failure to exhaust administrative remedies. Beard opposed on the ground his failure was excused by the Union's refusal to represent him. He did not argue in the superior court that even if the CBA grievance procedure and authority of the arbitrator covered his State claims, they did not encompass his claims against his supervisors. The superior court dismissed his claims on failure-to-exhaust grounds. We reversed in *Beard I* because it appeared there was a genuine fact dispute about whether the Union had refused to represent Beard on a claim that there was a pattern of harassment leading to constructive discharge. Beard argued in the *Beard I* appeal that none of his claims was arbitrable, but did not argue that even if his claims against the State were arbitrable, his claims against Venusti and McMullen were not. He did not argue in that appeal that even if summary judgment for

the State were affirmed, it should be reversed as to the supervisors.

Nor did Beard argue the issue in *Beard II*. Neither previous appeal raised a question whether a failure to exhaust might bar Beard's claims against the State but not his claims against individual supervisors. Both prior opinions tacitly assumed that the exhaustion issue applied equally to the IIED and constructive discharge claims against all defendants. The only dispute about the effect of the CBA was whether the arbitrator could fashion an adequate remedy, not whether the CBA was inapplicable to particular claims against the individual defendants even if it applied to claims against the State.

Beard argues in the present appeal that futility was proven because Senkow refused to grieve the supervisors' acts. He thus implicitly argues that the CBA grievance procedures encompassed the supervisors' wrongful acts.

As noted in the text, Beard argues for the first time in his petition for rehearing filed after we

Beard's petition for rehearing, filed after we issued our original opinion in *Beard III*, raises an argument he did not previously raise in *Beard I, Beard II,* or *Beard III:* that his claims against Venusti and McMullen are based at least in part on 42 U.S.C. § 1983, and to that extent are not subject to the exhaustion doctrine. He claims that his IIED claims were based on § 1983. In support, Beard cites *Patsy v. Board of Regents,* 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982), and *Diedrich v. City of Ketchikan,* 805 P.2d 362 (Alaska 1991).

Beard failed to assert a timely argument distinguishing between § 1983 claims and non-§ 1983 claims in opposing Venusti's and McMullen's fundamental defense, failure to exhaust, which has been the subject of three appeals and three appellate opinions. He also failed to raise a timely distinction between claims against the State and claims against Venusti and McMullen. Beard has consequently waived the argument that the exhaustion doctrine cannot bar his claims against Venusti and McMullen.

 Although the dissent, in resolving the exhaustion issue, would distinguish between Beard's IIED claims against Venusti and McMullen and his constructive discharge claims, Dissent at 13–14, Beard does not ask us to draw that distinction.

The dissent also suggests that the union's refusal to grieve a pattern of harassment excuses Beard's failure to exhaust his remedies with respect to the IIED claims. Dissent at 14. Several circumstances convince us otherwise. The union did agree to represent Beard on some grievances, and two grievances were still being processed when Beard resigned in August. After he resigned, the union complied with Beard's request to grieve the final evaluation issue. Nonetheless, after mid-May 1986 Beard never asked the union to grieve his work conditions, including the resignation itself or the post-May conduct that allegedly precipitated

his resignation. Because he did not timely ask the union to pursue the work conditions that were central to his IIED claims, he is not excused from failing to exhaust his remedies.

We consequently hold that the unexcused failure to exhaust that bars Beard's claims against the State also bars his claims against McMullen and Venusti. The well-recognized principles favoring exhaustion apply equally to claims against supervisors who engaged in the tortious conduct that formed the basis for Beard's State IIED and constructive discharge claims. The judgment against Venusti and McMullen must therefore be set aside.[6]

### B. *Other Issues*

Our resolution of the exhaustion question moots the remaining issues raised in the appeal and Beard's cross-appeal. Thus, vacating the judgment against the State, Venusti, and McMullen moots any dispute about when prejudgment interest began to accrue and whether an enhanced rate applied. It also moots the Civil Rule 60(b)(6) relief issue raised by McMullen and Venusti, and Beard's argument that the State's agreement to indemnify Venusti and McMullen is invalid because it violates public policy.

## IV. CONCLUSION

We conclude that the superior court abused its discretion in finding that Beard's failure to exhaust his administrative remedies was excused. We therefore REVERSE the judgment and REMAND with instructions to enter judgment for the State, Venusti and McMullen.

RABINOWITZ, J., concurring.

COMPTON, C.J., dissenting.

MOORE, J., not participating.

---

issued our original opinion in *Beard III* that the exhaustion doctrine cannot bar his claims against Venusti and McMullen asserted under 42 U.S.C. § 1983.

**6.** Because we conclude that the claims resulting in compensatory damages awards against

McMullen and Venusti were barred by the exhaustion doctrine, the compensatory damages awards against those defendants must be vacated. It follows that the substantial punitive damages awards against those defendants must also be set aside.

RABINOWITZ, Justice, concurring.

Although I agree that the superior court's judgment should be reversed and judgment entered for appellants and cross-appellees, I disagree with the court's reliance on *Casey v. City of Fairbanks*, 670 P.2d 1133 (Alaska 1983), in Section III.A.2 of the court's opinion. My reasons are as follows.

The court explains in Section III.A.2 that an employee's failure to exhaust administrative remedies is excused by the union's refusal to pursue a complaint when

> the union has sole power under the contract to invoke the higher levels of the grievance procedure *and* if the union has prevented the employee from exhausting his remedies by its wrongful refusal to process the grievance.

Op. at 6 (quoting *Croston v. Burlington N.R. Co.*, 999 F.2d 381, 386 (9th Cir.1993)). The court further explains that "[m]ost courts have equated a 'wrongful refusal' to process a grievance with a breach of the union's duty of fair representation." Op. at 6.

In *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), the Supreme Court of the United States reviewed a court's determination that an employee's failure to exhaust his arbitration remedies was excused. The Missouri Supreme Court relied on the fact that the jury found the employee's claim meritorious and thus held that the union must have breached its duty of fair representation by not grieving the claim. *Id.* at 192–93, 87 S.Ct. 903. The federal high court reversed.

*Vaca* begins by emphasizing the employer's interest in having employees adhere to agreed-upon grievance procedures; arbitration saves the employer the expense of litigation. *Id.* at 191–92, 87 S.Ct. 903. The Supreme Court also noted the contradiction in allowing a union's breach of duty to excuse an employee's failure to exhaust, since the employer "may have done nothing to prevent exhaustion of the exclusive contractual remedies to which he agreed in the collective bargaining agreement." *Id.* at 185, 87 S.Ct. 903. *Vaca* nevertheless concludes that to leave the employee remediless whenever the union fails to grieve would lead to "great injustice." *Id.* at 185–86, 87 S.Ct. 903.

The Supreme Court therefore settled on a standard that allows the employee to institute judicial proceedings only when the union's refusal to pursue his claim is wrongful. *Id.* at 185, 87 S.Ct. 903. In other words, the refusal must amount to a breach of the union's duty of fair representation. *Id.* at 190., 87 S.Ct. 903 The Court emphasized that it did "not agree that the individual employee has an absolute right to have his grievance taken to arbitration...." *Id.* at 191, 87 S.Ct. 903.

By insisting on this elevated standard, the Supreme Court sought not only to protect the employer's rights under the agreement, but also to preserve the union's discretion in deciding which complaints will be pursued. "[F]rivolous grievances" are weeded out early when "the union [has] discretion to supervise the grievance machinery and to invoke arbitration...." *Id.* In other words, the union acts as a gatekeeper. It must, "in good faith and in a nonarbitrary manner, make decisions as to the merits of particular grievances." *Id.* at 194, 87 S.Ct. 903. In detailing the policies underlying preservation of union discretion, *Vaca* states:

> If the individual employee could compel arbitration of his grievance regardless of its merit, the settlement machinery provided by the contract would be substantially undermined, thus destroying the employer's confidence in the union's authority and returning the individual grievant to the vagaries of independent and unsystematic negotiation. Moreover, under such a rule, a significantly greater number of grievances would proceed to arbitration. This would greatly increase the cost of the grievance machinery and could so overburden the arbitration process as to prevent it from functioning successfully. It can well be doubted whether the parties to collective bargaining agreements would long continue to provide for detailed grievance and arbitration procedures ... if their power to settle the majority of grievances short of the costlier and more time-consuming steps was limited by a rule permit-

ting the grievant unilaterally to invoke arbitration.

*Id.* at 191–92, 87 S.Ct. 903 (footnote and citations omitted).

The Supreme Court went on to conclude that the plaintiff employee in that case could not establish a breach of the union's duty of fair representation "merely by proof that the underlying grievance was meritorious"; the employee "must also have proved arbitrary or bad-faith conduct on the part of the Union in processing his grievance." *Id.* at 195, 193, 87 S.Ct. 903.

*Vaca*'s emphasis on the union as gatekeeper, with discretion to determine which complaints will go forward, is consistent with decisions both before and since. The Supreme Court had previously established that "individual employees wishing to assert contract grievances must *attempt* use of the contract grievance procedure agreed upon by the employer and union.... [T]here can be no doubt that the employee must afford the union the opportunity to act on his behalf." *Republic Steel Corp. v. Maddox,* 379 U.S. 650, 652–53, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965). It had also made clear that the union does not breach its duty of fair representation so long as it acts "honestly, in good faith and without hostility or arbitrary discrimination." *Humphrey v. Moore,* 375 U.S. 335, 350, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964); *see also Ford Motor Co. v. Huffman,* 345 U.S. 330, 338, 73 S.Ct. 681, 97 L.Ed. 1048 (1953) (emphasizing "hostile discrimination" based on "irrelevant and individious" considerations; no exception if union exercised good faith within "wide range of reasonableness").

In subsequent decisions, the Supreme Court has reiterated that exceptions to mandatory arbitration require "substantial evidence of discrimination that is intentional, severe, and unrelated to legitimate union objectives...." *Amalgamated Ass'n of St., Elec., Ry. and Motor Coach Employees v. Lockridge,* 403 U.S. 274, 301, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971). The Court hinted that a showing of negligence would not be sufficient. "[T]he burden of demonstrating breach of duty by the Union ... involves more than demonstrating mere errors in judgment.... The grievance processes can-

not be expected to be error-free." *Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 570–71, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976). At the core of these cases lies the principle that unions must be allowed to make independent determinations as to the merits of individual claims. "[U]nion discretion is essential to the proper functioning of the collective-bargaining system." *International Bhd. Elec. Workers v. Foust,* 442 U.S. 42, 51, 99 S.Ct. 2121, 60 L.Ed.2d 698 (1979).

In *United Steelworkers of America v. Rawson,* 495 U.S. 362, 110 S.Ct. 1904, 109 L.Ed.2d 362 (1990), the Supreme Court announced that while the duty of fair representation is of major importance,

> a breach occurs "only when a union's conduct toward a member ... is arbitrary, discriminatory, or in bad faith." The courts have in general assumed that mere negligence ... would not state a claim for breach of the duty of fair representation, *and we endorse that view today.*

*Id.* at 372–73, 110 S.Ct. 1904 (emphasis added) (citation omitted) (quoting *Vaca v. Sipes,* 386 U.S. 171, 190, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967)).

*Air Line Pilots Ass'n, Int'l v. O'Neill,* 499 U.S. 65, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991), affirms and elaborates:

> We hold that the rule announced in *Vaca v. Sipes*—that a union breaches its duty of fair representation if its actions are either "arbitrary, discriminatory, or in bad faith"—applies to all union activity.... We further hold that union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a "wide range of reasonableness" as to be irrational.

*Id.* at 67, 111 S.Ct. 1127 (citations omitted) (quoting *Vaca v. Sipes,* 386 U.S. 171, 190, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); *Ford Motor Co. v. Huffman,* 345 U.S. 330, 338, 73 S.Ct. 681, 97 L.Ed. 1048 (1953)). *O'Neill* went on to direct courts not to substitute their own judgment for that of the unions. "Any substantive examination of a union's performance ... must be highly deferential...." *Id.* at 78, 111 S.Ct. 1127.

The standard which emerges from this fairly consistent line of cases is that a union's decision not to pursue an employee grievance is reviewed only for an abuse of discretion. A union's refusal to grieve constitutes a breach of duty only when it stems from an improper motive or lacks a rational basis. As the gatekeeper to arbitration, the union must be allowed to independently decide which claims are meritorious and should go forward. Judicial review is deferential.

Burle Beard cannot meet this standard. There is no evidence that union representative Senkow's decision not to grieve Beard's claims as a pattern was the product of an improper motive. Nor can Beard show the decision was irrational. At the exhaustion hearing, Senkow himself testified that he had not discerned a pattern in the complaints Beard had brought to him.

Senkow also refused to grieve several of Beard's individual claims. Among these were complaints that a supervisor had asked Beard to justify his use of sick leave in May 1986, that he was forced to keep detailed time sheets, and that the supervisors avoided assigning work to Beard. The union's several refusals neither individually nor in combination constitute an abuse of discretion. The record contains absolutely no evidence that Senkow's decisions were the result of an improper motive, nor does Beard so allege. The only possible basis for finding that the union acted wrongfully is that the decisions were irrational.

Senkow's decisions had a rational basis. Senkow affied that he did not pursue the several individual claims because he felt they were "not provable" and the actions fell within "management prerogative." And both Senkow and Beard's witness testified that Senkow did not pursue the pattern complaint because he did not perceive a pattern of harassment against Beard.

As to the individual claims, Senkow's explanation for his refusal is in and of itself rational. The actions which Beard complained of—requiring detailed time sheets, justifying sick leave, and apportioning work load—are all decisions which management is generally entitled to make. Senkow could have rationally concluded that Beard's com-plaints would not have supported a successful grievance and should not be pursued. His determination that these actions were not provable as harassment because they fell within management discretion, while not necessarily correct, is not irrational. Furthermore, as discussed below, Senkow had reason to doubt Beard's interpretation of events.

As to Beard's pattern complaint, both parties' evidence indicates that Senkow simply did not perceive a pattern of harassment where Beard did. Senkow's skepticism of Beard's charge of a unified management conspiracy had a rational basis. Senkow's interactions with Beard and the events leading up to Beard's resignation could have led Senkow to conclude that Beard was unduly sensitive and there was no "pattern" against him. None of the evidence available to Senkow conclusively established the existence of an organized campaign.

The evidence which was available to Senkow could either have led him to conclude that Beard was the victim of management orchestrations or that he was a troublemaker. In support of the latter, Beard had charged that Milt Lentz, the Director of the Department of Transportation, had lied about a conversation with Beard during a visit to the office in May 1986. *Cameron v. Beard*, 864 P.2d 538, 543 n. 4 (Alaska 1993) (*Beard II*). However, it is entirely understandable that Senkow could decline to believe that the alleged conspiracy against Beard went to the highest levels of the Department of Transportation. Furthermore, the implausibility of the charge could also have led Senkow to discount Beard's other allegations, and to conclude that Beard was overly suspicious of his superiors. Senkow's decisions were not "wrongful." Beard cannot demonstrate that "in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational." *O'Neill*, 499 U.S. at 67, 111 S.Ct. 1127 (citation omitted) (quoting *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338, 73 S.Ct. 681, 97 L.Ed. 1048 (1953)). Nor does the fact that a jury ultimately found Beard's claims meritorious justify his failure to ex-

haust. This is precisely the argument that was rejected by the Supreme Court in *Vaca*.

In my view, *Vaca* articulates a reasonable standard for determining when an employee's failure to exhaust administrative remedies is excused. The *Vaca* test essentially determines when the employer will be denied the protections of mandatory arbitration because of something the union did. It is reasonable to accord the union discretion over which complaints should be pursued. As a gatekeeper, the union preserves the integrity of the arbitration process by screening out frivolous complaints. If courts did not defer to union decisions, and a union refusal always allowed the grievant to go to court, employers would have little incentive to enter into arbitration agreements in the first place. In this regard, I find the Supreme Court's reasoning compelling. *See Vaca*, 386 U.S. at 191–92, 87 S.Ct. 903.

Furthermore, the standard for exceptions to exhaustion articulated in *Casey v. City of Fairbanks*, 670 P.2d 1133 (Alaska 1983), is arguably incorrect. Despite this court's acknowledgment of federal preemption, *Casey* adopted the test articulated in *Eidelson v. Archer*, 645 P.2d 171 (1982), which asks only whether the employee made a good faith effort to seek arbitration. *Casey*, 670 P.2d at 1136. *Eidelson* is inapposite. That case did not involve a collective bargaining agreement and the plaintiff was not dependent on a union for access to administrative remedies. In fact, the plaintiff there was not even a member of a labor union. *Eidelson* involved a doctor's challenge to a private hospital's termination of his staff privileges. *See Eidelson*, 645 P.2d at 172–75. This situation is entirely outside the scope of the Labor Management Relations Act. *Eidelson* is simply an application of the general rule that "an aggrieved member of a private association must exhaust the remedies provided by the organization before seeking judicial action against the association." *Id.* at 179. The policy driving the decision was that internal remedies allow an organization to apply its expertise and correct its own errors. *Id.* at 176. The *Eidelson* standard has nothing to do with *Vaca*: no labor union was involved, the doctor had direct access to administrative remedies, and it was unnecessary to determine if a union's refusal to grieve was wrongful. *Casey*'s reliance on that case is misplaced. Since I am of the view that *Casey* is in conflict with binding federal law, I would disapprove it.[1]

COMPTON, Chief Justice, dissenting.

## I. *IIED*

I accept, *arguendo*, the court's characterization of *Beard I* and I assume as well that the court is correct in requiring Beard to exhaust his contractual remedies as to individual defendants. The court nevertheless errs, as a matter of fact, in holding that Beard should not be excused from exhausting his contractual remedies as to his claim for IIED. It may be arguable that Beard failed to exhaust his contractual remedies as to the constructive discharge claim.[1] Beard's resignation was the last essential element of that claim. Beard did not specifically request that Senkow grieve a claim "for constructive discharge" after Beard resigned—after the cause of action arose.

However, Beard's resignation was not an essential element of his claim for IIED. A claim for IIED requires only "(1) that the defendant's conduct was extreme and outrageous, (2) that the conduct was intentional or reckless, (3) that this conduct caused the plaintiff emotional distress, and (4) that the distress was severe." *Cameron v. Beard*, 864 P.2d 538, 548 (Alaska 1993).

Beard did request that Senkow grieve the "pattern of harassment" against him. It is this pattern of harassment which supports both the IIED claim and the constructive discharge claim. Although it is arguable that the constructive discharge claim did not arise until after Beard resigned, no such argument can be made as to the IIED claim. Senkow

---

**1.** This court has held that the federal common law of collective bargaining, including the rules for exceptions to mandatory arbitration, are binding in state cases. *See International Bhd. of Teamsters, Local 959 v. King*, 572 P.2d 1168, 1172 (Alaska 1977) ("Even though this case is in state court, the law to be applied to this issue is federal labor-management common law.").

**1.** *But see, infra,* Parts II and III.

explicitly refused to recognize the pattern of harassment alleged by Beard, which supports his claim for IIED. Under even the court's stringent interpretation of *Casey v. City of Fairbanks,* 670 P.2d 1133 (Alaska 1983), Beard has complied with the requirements for excusing his failure to exhaust his contractual remedies as to his IIED claim.[2]

The court fails to adequately explain why it requires Beard to have asked the union to grieve conduct that occurred "after mid-May 1986." Op. at 9. The pattern of harassment alleged by Beard *prior* to that time is sufficient to support his claim for IIED. Senkow's explicit refusal to grieve this pattern of harassment is sufficient to satisfy the court's interpretation of *Casey.* The court's assertion that Beard "did not timely ask the union to pursue the work conditions that were central to his IIED claims," Op. at 9, is inaccurate. The judgments against McMullen and Venusti should be affirmed.

## II. *Constructive Discharge*

The rule laid down by the court is a harsh one:

> Where an ongoing pattern of harassment in the workplace culminates in an employee's resignation, the employee must attempt to grieve this involuntary termination *even if the union has previously been unresponsive to the employee's complaints of harassment.*

Op. at 7 (emphasis added). In the instant case, we have an employee who consistently requested that his union representative aid him in grieving a pattern of harassment. His union representative consistently denied that such a pattern existed or was grievable. Nonetheless, this court requires Beard to know that such a pattern becomes grievable when he is actually forced to resign. Had Beard but known to invoke the magic words "constructive discharge" following his resignation, he would not be faced with this appeal.

This formalistic reasoning leads to an unjust result. It requires employees to possess both specific legal knowledge and unreason-

able tenacity. Beard made a good faith effort to resolve his overall working conditions through the available grievance procedures. His union failed to come to his aid. We should require no more than this before permitting employees to turn to the courts for the assistance that their unions refuse to provide.

## III. *Law of the Case*

That said, I adhere to the view I expressed in *Cameron v. Beard,* 864 P.2d 538 (Alaska 1993) (*Beard II* ). In *Beard II* I dissented from the court's decision to remand for an evidentiary hearing on the issue of whether Beard was excused from exhausting his contractual remedies. *Id.* at 551–53 (Compton, J., dissenting). My position was that this issue was raised and resolved in *Beard I. Id.* at 551. I remain convinced that in *Beard I* this court "unqualifiedly and unconditionally held that Beard was excused from exhausting his contractual remedies." *Id.* at 552. *See Wolff v. Arctic Bowl, Inc.,* 560 P.2d 758, 763 (Alaska 1977) ("The doctrine of the law of the case prohibits the reconsideration of issues which have been adjudicated in a previous appeal in the same case.").

I dissent.

---

2. *"Casey* requires, at a minimum, that the employee establish that the union explicitly refused to grieve a complaint before the employee is

excused from pursuing administrative remedies." Op. at 5.